James M. SCOTT, Jr.,
Plaintiff–Appellant,

v.

Robert C. FLOWERS, et al.,
Defendants–Appellees.

No. 89–2491.

United States Court of Appeals,
Fifth Circuit.

Aug. 20, 1990.

202

Robin Sanders, Austin, Tex., for defendants-appellees.

Before KING, GARWOOD, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Today we are asked to decide whether an elected judge may constitutionally be reprimanded for making truthful public statements critical of the administration of the county judicial system of which he is a part. Concluding (1) that such statements address matters of legitimate public concern and (2) that the state's interest in promoting the efficiency and impartiality of its courts does not, under the circumstances of this case, outweigh the plaintiff's countervailing first amendment right to air his views, we reverse the judgment of the district court and remand for further proceedings.

## I.

### A.

In 1982, plaintiff James M. Scott, Jr., was elected to a four-year term as justice of the peace in Fort Bend County, Texas. As in many states, justices of the peace in Texas occupy the lowest rung of the judicial hierarchy. Their courts have jurisdiction to hear only petty criminal prosecutions (such as traffic violations), actions for forcible entry and detainer, and other civil cases in which the amount in controversy does not exceed $2,500. *See* Tex. Const. Art. V, § 19; Tex.Gov't Code Ann. § 27.031. In most Texas counties, Fort Bend among them, justice courts are not courts of record, and parties appealing from their judgments are entitled to a trial *de novo* in a higher court.

Soon after taking office, Scott became concerned about what he perceived to be an injustice in the administration of the county court system. Apparently, the great majority of defendants who appealed their traffic offense convictions from justice or municipal courts to the Fort Bend County

Bruce V. Griffiths, Houston ACLU, Houston, Tex., for plaintiff-appellant.

Court-at-law during Scott's term in office succeeded in having the charges against them dismissed or the fines sharply reduced.[1] This practice, Scott believed, unfairly allowed those "in the know" to violate the traffic laws repeatedly and with impunity while penalizing less sophisticated individuals who committed the same offenses.

In September 1983, Scott took his concerns to the local government and the citizenry by writing an "open letter" to county officials. In the letter, Scott attacked the district attorney's office and the county court-at-law for dismissing so many traffic ticket appeals and called upon the county officials to offer suggestions to remedy the problem. If the county refused to change this practice, Scott concluded, the public at least should be made aware of it, and the court-at-law "would be really busy then." [2]

The letter was circulated to the local press and prompted several newspaper articles. It also attracted the attention of Thomas Culver, one of the judges of the court-at-law, who wrote Scott an angry letter criticizing him for not raising his concerns privately. Eventually, both the newspaper articles and Culver's letter found their way into the files of the Texas

Commission on Judicial Conduct (the "Commission").[3]

In November 1983, the Commission's executive director, defendant Robert C. Flowers, advised Scott by letter that he had been the subject of several complaints received by the Commission.[4] Scott responded to the complaints both in writing and in person, having been invited by Flowers to appear informally before the Commission.

On March 19, 1984, the Commission issued a formal public reprimand of Scott. After first acknowledging that Scott's intentions were good and his personal integrity was not at issue, the Commission then chided him for being "insensitive" in certain "written and oral communications" addressed both to the litigants in his courtroom and to the public at large. Such "insensitivity," the Commission stated, was inconsistent with the proper performance of Scott's duties as justice of the peace and served only to "cast public discredit upon the judiciary." The Commission concluded the reprimand with a warning, advising Scott to be "more restrained and temperate in written and oral communications in the future."

Although the Commission failed to cite any examples of Scott's alleged insensitivi-

1. The truth of these allegations has never been contested in this litigation.

2. The letter states, in its entirety, as follows:
 *Dear County Officials:*
 In the nine months that I have been Justice of the Peace of Precinct Four in Fort Bend County, I have learned of a practice in our County Court at Law Court, and the District Attorney's Office, that I believe adversely affects justice in our county. Almost all of the cases appealed to this court are dismissed totally and the few cases that are not dismissed are 'plea bargained' down to very low fine amounts.
 Of the 123 decisions made through the end of August, 1983, all but 17 were completely dismissed; i.e., more than 86% were dismissed after being found guilty by the Justice or Municipal Courts of Fort Bend County. Of the few cases decided, most all had only 'token' fines of $10.00 or less. The average fine per case appealed to the County Court at Law Court is only $4.05.
 Until now, only a few people represented by local attorneys 'knew' that an appeal was really a dismissal. This allows those few people to violate the law repeatedly and never devel-

ope [sic] a bad driving record. If it is the policy of the County to not prosecute appeals from the Justice of the Peace Courts and the Municipal Courts, then everyone should be made aware of it; the County Court at Law Court and the District Attorney's Office would really be busy then.
 Please contact me and offer your suggestions and opinions.
 Respectfully,
 James M. Scott, Jr.
 Justice of the Peace
 Precinct Four
 Fort Bend County

3. The Commission is empowered by the Texas Constitution to discipline state judges for "willful violation of the Code of Judicial Conduct, or willful and persistent conduct that is clearly inconsistent with the proper performance of his duties or casts public discredit on the judiciary or on the administration of justice." *See* Tex. Const. Art. V, § 1–a(6)A.

4. Some of those complaints concerned the open letter; others dealt with unrelated matters not at issue in this litigation.

ty to litigants,[5] it was quite specific in identifying the public comments it found to be objectionable. The Commission criticized Scott both for his statement in the open letter that the county court-at-law "would be really busy" if the public realized that an appeal of a traffic ticket was tantamount to a dismissal and for his comment to a reporter, in connection with the letter, that "the county court system is not interested in justice."[6]

### B.

In March 1986, Scott filed this 42 U.S.C. § 1983 action against the members of the Commission, both individually and in their official capacities. He alleged that his open letter, and his comments to reporters in connection with it, were protected speech for which he could not constitutionally be subject to discipline. Scott's complaint sought a declaratory judgment that portions of the reprimand violated his first amendment rights, an injunction ordering the Commission to expunge those offending portions from his record, and attorneys' fees pursuant to 42 U.S.C. § 1988, but did not request any monetary damages.

After the parties had completed discovery, both sides moved for summary

5. The reprimand does, however, refer to an alleged threat Scott made to certain peace officers who were pursuing a grievance against him through legitimate channels. Although Scott denies making such a threat, he concedes that such threats are outside the ambit of the first amendment's protections and thus does not assert that that portion of the reprimand is a violation of his constitutional rights.

6. The reprimand states, in its entirety, as follows:

State Commission on Judicial Conduct
Public Reprimand of James M. Scott, Jr., Justice of the Peace Precinct of Fort Bend County, Texas.

As you are aware, at its regularly scheduled meeting on March 9, 1984, the State Commission on Judicial Conduct reviewed several complaints which had been filed against you by various individuals with whom you have had dealings with [sic] in your official capacity as Justice of the Peace, Precinct 4, Fort Bend County. You had previously been advised, in writing, of the complaints, and had submitted written responses thereto. You had also been invited by the Commission to appear informally at the regularly scheduled meeting, and did so appear.

It is apparent that your intentions have been to be scrupulously faithful to the law, and your personal integrity was not questioned. However, it is also apparent that there have been instances when you have been very insensitive to the effects of your written and oral communications on the litigants in your court. It was the Commission's conclusion that your insensitivity in written and oral communications, related to the complaints filed with the Commission, has cast discredit upon the judiciary and the administration of justice. Your insensitivity in communication appears to be a common thread in each of the complaints against you and can be exemplified by an incident in which Department of Public Safety Officers interpreted certain of your representations as a serious threat of retaliation against them for their

pursuit, through legitimate channels, of a grievance against you.

Additionally, it was the Commission's conclusion that certain public statements by you were inconsistent with the proper performance of your duties as a justice of the peace and cast public discredit upon the judiciary. Certainly, judges may make public statements in the course of their official duties or explain for public information the procedures of the court. However, judges must also conduct themselves at all times, in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Exemplifying an improper statement which the Commission considers to be destructive of public confidence in the judiciary is the statement attributed to you by a reporter, published in a paper, and acknowledged by you during your appearance before the Commission, to the effect that, 'It seems the county court system is not interested in justice.' Another statement the Commission considered as destructive to public confidence in the judiciary is the penultimate sentence in your open letter of September 27, 1983, to county officials concerning county court at law appeals. After impinging on, '... the policy of the County not to prosecute appeals ...' the sentence somewhat maliciously concludes that the public should be made aware and the County Court at Law 'would really be busy then.'

The Commission condemns your conduct described above and hopes that this action will cause you to be more restrained and temperate in written and oral communications in the future.

Accordingly, pursuant to the authority contained in Article V, Section 1–a, Subsection (8) of the Texas Constitution, it is

ORDERED that the conduct heretofore outlined is made the subject of a public reprimand by the State Commission on Judicial Conduct.

Issued this 19th day of March 1984.
Robert C. Flowers, Executive Director
Acting for and On Behalf of the State Commission on Judicial Conduct with Full Authority so to Act

judgment. In support of its motion, the Commission[7] introduced identical affidavits from nine (a majority) of its members, each stating that while Scott's open letter had been a "substantial factor" in the affiant's decision to vote in favor of reprimand, it had been "by no means the controlling factor." The affidavits were uncontroverted, and, unlike the reprimand itself, listed specific examples of Scott's "insensitivity" to the litigants in his courtroom and explained that those incidents, along with the open letter, had prompted the reprimand.

The Commission argued that the summary judgment record established that Scott would have been reprimanded even if he had not written the open letter or shared his views with reporters and therefore that, under the analysis set forth in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), he was entitled to no relief even if his public comments were in fact protected speech. Scott responded that *Mt. Healthy* was inapplicable because he, unlike the plaintiff in that case, did not seek to be placed in a better position because of his constitutionally protected conduct. Moreover, he contended that the summary judgment record amply demonstrated that his statements addressed matters of public concern and that his right to make them was not outweighed by the Commission's asserted interest in maintaining the integrity of the state's judicial system.

## C.

The district court granted summary judgment in favor of the Commission. Without citing *Mt. Healthy,* but apparently relying upon it, the court concluded that Scott would have been reprimanded even if

he had not written the open letter and therefore that he was entitled to no relief. The court thus found it unnecessary "to reach the issue of whether Plaintiff's conduct in writing the letter is in fact constitutionally protected activity."

## II.

■ Before addressing the merits of this appeal, we must examine the basis of federal jurisdiction, on our own motion[8] if necessary. *Mosley v. Cozby,* 813 F.2d 659, 660 (5th Cir.1987). Although none of the parties has directed our attention to it, we of course are aware of the rule proscribing federal district court review of state court judgments,[9] and of its implications for this case in light of *Thomas v. Kadish,* 748 F.2d 276 (5th Cir.1984), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985). There, we extended that rule to deprive the federal district courts of jurisdiction over the claims of individuals who are aggrieved by the judicial acts of state agencies controlled by state courts and who deliberately bypass available channels of state court review.

Accordingly, we must decide in this case whether the Commission's reprimand of Scott was a judicial act, whether the Commission is the agent of the state courts, and finally, whether Scott intentionally refrained from seeking state court review of the Commission's decision. We begin our discussion of these questions with a review of the facts and rationale of *Thomas* and its predecessor, *Feldman.*

In *Feldman,* an applicant who was denied admission to the District of Columbia bar on the ground that he had not graduated from an accredited law school petitioned the District of Columbia Court of Appeals

---

**7.** Except where it is necessary to distinguish them, the individual defendants, all of whom are members or former members of the Commission, are referred to collectively simply as "the Commission."

**8.** Although none of the parties raised this jurisdictional issue, they filed letter briefs that we requested following oral argument.

**9.** Final judgments of a state's highest court are not subject to federal district court review; in-

stead "[r]eview of such determinations can be obtained only in ... [the Supreme] Court." *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 476, 103 S.Ct. 1303, 1311, 75 L.Ed.2d 206 (1983) (following *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923), and hence called the "*Rooker–Feldman* doctrine"). *Accord Howell v. Supreme Court of Tex.,* 885 F.2d 308, 311 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3213, 110 L.Ed.2d 661 (1990).

for a waiver of that requirement in his case. When his petition was denied, Feldman brought suit in federal district court, seeking (1) a declaratory judgment that the denial of his application violated the fifth amendment and the federal antitrust laws and (2) an injunction ordering the defendants to admit him to the bar. The court dismissed Feldman's claim for lack of subject matter jurisdiction, reasoning that the denial of a waiver by the District of Columbia Court of Appeals was, in effect, a judicial determination by a state's highest tribunal. The United States Court of Appeals for the District of Columbia Circuit reversed and remanded on the ground that the waiver proceedings at issue were not judicial, but rather administrative, in nature. *Feldman v. Gardner,* 661 F.2d 1295, 1315–19 (D.C.Cir.1981).

On review, the Supreme Court concluded that the waiver proceedings were in fact judicial, since their purpose was to "investigate, declare, and enforce 'liabilities as they [stood] on present or past facts and under laws supposed already to exist.'" *District of Columbia Court of Appeals v. Feldman,* 460 U.S. at 479, 103 S.Ct. at 1313 (quoting *Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 226, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908)). Accordingly, the Court reversed and ordered Feldman's claims dismissed.[10]

In *Thomas,* we applied the *Rooker–Feldman* doctrine to a case that differed from *Feldman* in only one important respect— unlike Feldman, Thomas did not seek state court review of the denial of his bar application; instead, he proceeded directly to federal district court and brought a section 1983 claim alleging that he had been denied admission because of his race and religious beliefs. Thomas contended that the Texas

Board of Law Examiners (the "Board"), which had denied his application, was not a court but rather an administrative agency, and, accordingly, that under *Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982),[11] he was not required to exhaust state remedies before bringing a constitutional claim in federal court.

Although we found those contentions "substantial," *Thomas,* 748 F.2d at 278, we nevertheless concluded that the *Rooker–Feldman* doctrine precluded federal district court review of Thomas's claims, for two reasons: First, the Board was essentially the agent of the Texas Supreme Court, which had promulgated the rules governing the Board's activities and appointed the Board's nine members. And second, Thomas had failed to pursue available channels of state court review:

> [T]he Texas state supreme court has itself provided for a method of judicial review of the Board's denial of fitness. A rejected applicant's deliberate bypass of those procedures that envisioned (ultimately) a reviewable final state-court judgment, itself under *Feldman* not subject to federal district-court review, should not, it would seem, entitle the applicant to a review of his constitutional claims by a federal district court that would have been unavailable to him if he had pursued his claim to final state court judgment. Under *Feldman,* 'a petitioner's failure to raise his constitutional claims in state court does not mean that a United States District Court should have jurisdiction over the claims,' 460 U.S. at 483 n. 16 [103 S.Ct. at 1315 n. 16] ..., and 'by failing to raise his claims in state court a plaintiff may forfeit his

---

**10.** Feldman was, however, allowed to proceed with those of his claims that attacked the facial validity of the District of Columbia's bar admissions rules. As the Court explained, "United States district courts ... have subject-matter jurisdiction over general challenges to state bar rules, promulgated by state courts in nonjudicial proceedings, which do not require review of a final state-court judgment in a particular case. They do not have jurisdiction, however, over challenges to state-court decisions in particular cases arising out of judicial proceedings even if

those challenges allege that the state court's action was unconstitutional. Review of those decisions may be had only in this Court." 460 U.S. at 486, 103 S.Ct. at 1317. *See Howell,* 885 F.2d at 311–12.

**11.** *Patsy* holds that "exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983." 457 U.S. at 516, 102 S.Ct. at 2568.

right to obtain review of the state court decision in any federal court,' *id.*

*Id.* at 282.

■ With this background in mind, we now proceed to answer the three questions posed earlier in our discussion. We have little difficulty in concluding that the Commission's reprimand of Scott was a judicial act. As the Court explained in *Feldman*, a proceeding is judicial when it "investigate[s], declare[s], and enforce[s] liabilities ... on present or past facts and under laws supposed already to exist." 460 U.S. at 479, 103 S.Ct. at 1313. Here, the Commission investigated the complaints lodged against Scott, declared him in violation of the then-existing Code of Judicial Conduct, and enforced its determination by issuing a public reprimand.

Despite the judicial nature of its actions, however, the Commission cannot be regarded as the agent of the state court system. Unlike the Board in *Thomas*, the Commission is constitutionally established and is endowed with a measure of independence from the courts. Whereas the Board's nine members all are appointed directly by the Texas Supreme Court, the Commission's eleven members are chosen in three different ways: five are appointed by the Texas Supreme Court (three of those with the advice and consent of the Texas Senate), two are appointed by the State Bar of Texas with the advice and consent of the Senate, and four (who must be non-lawyers) are appointed by the governor with the advice and consent of the senate. Tex. Const. Art. V, § 1–a(2). Thus, not even a majority of the Commission's members are chosen by the Supreme Court, and three of the commissioners nominated by the court must be confirmed by an independent body.[12]

Moreover, whereas the licensing of lawyers and the regulation of the state bar traditionally have been regarded as functions of the state's highest court, the discipline of judges (at least in Texas) is not exclusively or even predominantly the province of that court. The Texas Constitution provides five methods for the removal of judges, only three of which involve the courts at all and none of which gives the Texas Supreme Court the power to remove or sanction a judge on its own initiative.[13] In sum, both the structure and functions of the Commission make it largely independent of the state courts; accordingly, it cannot be viewed as their agent.

Finally, Scott, unlike Thomas, did not bypass channels of state court review provided for by the Texas Supreme Court. As the Commission concedes, no appeal from its reprimands was available until 1987, one year after Scott had filed the instant lawsuit in federal district court. In addition, the 1987 statute allowing such appeals explicitly provides that it does not apply to reprimands issued before its effective date. Tex. Gov't Code Ann. § 33.034.

Thus, Scott had no vehicle other than a civil rights suit by which to challenge the Commission's allegedly unconstitutional reprimand. Although he could have elected to bring such an action in either state or federal court, his choice of the federal fo-

---

**12.** In *First Amendment Coalition v. Judicial Inquiry & Review Bd.*, 501 Pa. 129, 460 A.2d 722 (1983), the court held that Pennsylvania's Judicial Inquiry and Review Board (a constitutionally established nine-member body, five of whose members are appointed by the state supreme court and four of whose members are appointed by the governor, and whose functions are virtually identical to those of the Commission) was an independent agency, rather than a court, and therefore could not be issued a writ of mandamus. Because a majority of that board's members are appointed by the state supreme court (without the advice and consent of the state senate), it is *less* independent of the state court system than is the Commission in the instant case.

**13.** Those five methods are as follows: Article XV, § 2 provides for removal of judges by the senate. Article XV, § 6 provides for removal of district judges by the supreme court upon the sworn presentment of ten lawyers practicing before the judge whose removal is sought. Article XV, § 8 provides for removal of judges by the governor upon a resolution of two-thirds of each house of the legislature. Article V, § 1–a(8) empowers the Commission to recommend removal to a review tribunal composed of judges of the state courts of appeals. And finally, Article V, § 24 provides for the removal of county judges and justices of the peace by state district judges.

rum does not in any way suggest a deliberate circumvention of state court review. We thus conclude that we have jurisdiction to consider Scott's first amendment claims, and we now proceed to evaluate their merits.

## III.

■ We must first revisit the district court's threshold determination that *Mt. Healthy* precludes Scott from obtaining any relief even if his constitutional rights were violated. In *Mt. Healthy*, plaintiff Doyle, a schoolteacher who had been fired shortly after criticizing school policy in a telephone call to a local radio station, sued the school board for reinstatement and back pay, claiming that his discharge was in violation of the first amendment. The district court held that Doyle's telephone call was protected speech and that, because it had played a "substantial part" in the school board's decision to terminate him, Doyle was entitled to the relief he sought. The Sixth Circuit affirmed in an unpublished per curiam opinion.

On review, the Supreme Court accepted the district court's finding that Doyle's telephone call was protected speech but not its conclusion that Doyle was entitled to reinstatement and back pay simply because that speech had been a "substantial factor" in the board's decision to terminate him. Instead, the Court reasoned that the board should be given the opportunity to prove that it would have discharged Doyle even if he had not made the telephone call.[14] As the court explained,

> A rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the

exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment decision resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

429 U.S. at 285–86, 97 S.Ct. at 575–76. Simply stated, the rule of *Mt. Healthy* is that a public employee who is discharged or otherwise disciplined for engaging in constitutionally protected conduct is not entitled to any relief if the employer can prove that it would have taken the same action absent that conduct.

■ The Commission has not, and indeed, cannot on the facts of this case, make the showing required by *Mt. Healthy*.[15] The pertinent paragraph of the reprimand deals solely with Scott's open letter and with his comments to a reporter in connection with that letter. Although the Com-

---

**14.** Apparently, Doyle had also aroused the anger of the school board by (1) arguing with cafeteria workers over the amount of spaghetti they had served him, (2) referring to students against whom he had taken disciplinary measures as "sons of bitches," and (3) making an obscene gesture to two female students. 429 U.S. at 281–82, 97 S.Ct. at 573–74.

**15.** The Commission correctly points out that recently we have applied the *Mt. Healthy* analy-

sis in cases not involving retaliatory discharge. *See North Miss. Communications, Inc. v. Jones*, 874 F.2d 1064 (5th Cir.1989). This argument, however, is completely beside the point. *Mt. Healthy* is inapplicable to this case not because it does not involve retaliatory discharge, but rather because the relief Scott seeks will not put him in a better position than he would have occupied but for the allegedly protected conduct.

mission might have reprimanded Scott for other reasons, had he not written the letter, it could not then have based any portion of the reprimand upon that letter. And since Scott seeks only to have that part of the reprimand dealing with the allegedly protected conduct expunged from his record, he will not be put into a better position than he otherwise would have occupied if that relief is granted. We thus conclude that the district court erred in its application of *Mt. Healthy* to the facts of this case and now proceed to evaluate the merits of Scott's claim.

## IV.

### A.

■ Public employees, in their capacity as such, occupy a unique position in first amendment jurisprudence. The Supreme Court has always recognized that the state as employer may restrict the speech of its employees in ways in which the state as sovereign may not restrict the speech of its citizens. Indeed, the Court for many years adhered to the position that public employees could be fired for expressing their views, notwithstanding the fact that they had a constitutional right to do so—that is, that "[a policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *See Rankin v. McPherson,* 483 U.S. 378, 395, 107 S.Ct. 2891, 2902, 97 L.Ed.2d 315 (1987) (Scalia, J., dissenting) (quoting

*McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 29 N.E. 517, 517 (1892) (Holmes, J.)).

■ More recently, however, the Court has rejected that approach in favor of one recognizing that public employees do not shed constitutional protection when they enter the workplace [16] but nevertheless balancing those employees' rights against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In *Pickering,* the Court enunciated the two-step inquiry to be used in evaluating claims of first amendment violations by public employees. First, the court [17] must determine, in light of the "content, form, and context" of the speech in question, *see Moore v. City of Kilgore,* 877 F.2d 364, 369 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989), whether it addresses a "matter of legitimate public concern." *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736.[18] If it does not, the inquiry ends, for "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive insight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1690.

**16.** *See Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967) ("[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.").

**17.** "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983); *see also Kirkland v. Northside Indep. School Dist.,* 890 F.2d 794, 798 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

**18.** Although the courts have not developed a precise definition of "matters of public concern," they have found such matters in a teacher's public criticism of the school board's allocation of funds between academics and athletics, *Pickering,* 391 U.S. at 571, 88 S.Ct. at 1736; a

teacher's private complaints (raised in a conversation with the school principal) regarding allegedly racially discriminatory school policies, *Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979); and in a firefighter's public attack on the alleged inadequacy of the fire department's level of manpower, *Moore,* 877 F.2d at 370–71; but not in a teacher's disagreement with a prescribed reading list, *Kirkland,* 890 F.2d at 800.

Public employees do not address matters of public concern, however, when their statements deal only with the conditions of their own employment. Thus, an assistant district attorney who circulates a questionnaire in order to elicit the views of her fellow employees on office morale and transfer policies is not entitled to first amendment protection. *Connick,* 461 U.S. at 148–49, 103 S.Ct. at 1690–91.

If the court determines that the employee's speech addresses a matter of public concern, it then must balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal functions. In assessing the strength of the governmental interest, the court should consider such factors as "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899 (citing *Pickering,* 391 U.S. at 570–73, 88 S.Ct. at 1735–37).

### B.

 We have no difficulty in concluding that Scott's open letter, and the comments he made in connection with it, address matters of legitimate public concern.[19] Scott raised his criticisms of the court-at-law and the district attorney's office in a manner calculated to attract the attention of the public—the body with the ultimate power to change county policy by voting the responsible officials out of office. The public indeed was interested in Scott's views, as evidenced by the attention given his letter by the local media. *See Moore,* 877 F.2d at 371 (citing media attention given to public employee's speech as evidence that it addressed a matter of public concern).

Moreover, Scott's criticisms had nothing to do with his own conditions of employment. Instead, they dealt with the administration of the county justice system by county officials, a matter about which Scott, as an elected judge from that county, was likely to have well-informed opinions.

The facts of this case thus make it quite similar to *Pickering,* in which the Court had this to say in determining that a teacher's criticism of the school board's funding decisions raised issues of public concern:

> [T]he question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question, free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliation.

391 U.S. at 571–72, 88 S.Ct. at 1736–37.

In sum, we conclude that in airing his views on the administration of the Fort Bend County justice system, Scott was speaking not as an employee about matters of merely private interest, but rather as "an informed citizen regarding a matter of great public concern." *Moore,* 877 F.2d at 371. We now proceed to determine whether, under the circumstances of this case, Scott's right to speak is outweighed by the state's asserted interest in promoting the efficiency and impartiality of its judicial system.

### C.

 We begin by noting that the state's interest in suppressing Scott's criticisms is much weaker than in the typical public employee situation,[20] as Scott was not, in the traditional sense of that term, a public

---

**19.** Indeed, the Commission, in its brief, does not argue that Scott's public statements did not address issues of legitimate public concern. Instead, it rests its argument upon *Mt. Healthy* and upon the second prong of the *Pickering* balancing test, asserting that its interest in preserving the integrity of the state's judicial system outweighs Scott's first amendment rights.

**20.** Of course, if Scott were a private citizen, the state would have *no* justification for suppressing his criticisms of the county justice system. It has long been settled that speech critical of the courts may not be suppressed unless it presents a "clear and present danger" to their operation. *See, e.g., Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962) (overruling contempt conviction of sheriff who criticized, as racist, judge's order that grand jury investigate "an

*employee.* Unlike the teacher in *Pickering,* the assistant district attorney in *Connick,* and the firefighter in *Moore,* Scott was not hired by a governmental employer. Instead, he was an elected official, chosen directly by the voters of his justice precinct, and, at least in ordinary circumstances, removable only by them.

■ As such, it was not unexpected that Scott not only would exercise independent judgment in the cases brought before him but would be willing to speak out against what he perceived to be serious defects in the administration of justice in his county. Thus, the state cannot justify the reprimand of Scott, as it could the discipline of an ordinary government employee, on the ground that it was necessary to preserve coworker harmony or office discipline.[21]

■ As the Commission correctly points out, we have recognized that the state may restrict the speech of elected *judges* in ways that it may not restrict the speech of other elected officials. In *Morial v. Judiciary Comm'n of La.,* 565 F.2d 295, 305 (5th Cir.1977) (en banc), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978), we upheld a state statute requiring judges to resign from the bench before declaring their candidacy for an elective non-judicial office and ·explained that the state may regulate the speech of judges in order to preserve the impartiality of the judicial branch:

> Because the judicial office is different in key respects from other offices, the state may regulate its judges with the differences in mind. For example the contours of the judicial office make inappropriate the kind of particularized pledges of conduct in office that are the very stuff of

campaigns for most non-judicial offices. A candidate for the mayoralty can and often should announce his determination to effect some program, to reach a particular result on some question of city policy, or to advance the interests of a particular group. It is expected that his decisions in office may be predetermined by campaign commitment. Not so the candidate for judicial office. He cannot, consistent with the proper exercise of judicial powers, bind himself to decide particular cases in order to achieve a given programmatic result.

We were careful to note, however, that our holding in *Morial* was a narrow one, turning on the fact that the resign-to-run statute, and restrictions on judicial campaign promises, were fairly limited intrusions into the political speech of elected judges. That is, "Louisiana's resign-to-run requirement does not burden the plaintiff's right to vote for the candidate of his choice *or to make statements regarding his private opinions on public issues outside a campaign context;* nor does it penalize his belief in any particular idea. These are core first amendment values." *Id.* at 301 (emphasis added).

■ Unlike the statute upheld in *Morial,* the reprimand of Scott does infringe upon the right "to make statements . . . on public issues outside a campaign context" and thus touches upon "core first amendment values."[22] Accordingly, the Commission must carry a very difficult burden in order to demonstrate that its concededly legitimate interest in protecting the efficiency and impartiality of the state judicial system outweighs Scott's first amendment rights.[23]

---

inane and inexplicable pattern of Negro bloc voting"); *Pennekamp v. Florida,* 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) (overruling contempt conviction of newspaper editor who published editorials and cartoons attacking judge as soft on gamblers).

**21.** Moreover, although Scott probably had some contact with the district attorneys and the judges of the court-at-law, he did not work with them on a day-to-day basis, and his relationship with them was not the sort of close working

relationship that requires personal confidence and loyalty.

**22.** *See also Connick,* 461 U.S. at 145, 103 S.Ct. at 1689 ("the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection" (quoting *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982))).

We conclude that the Commission has failed to carry that burden. Neither in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary, and we are unpersuaded that they would have such a detrimental effect. Instead, we believe that those interests are ill served by casting a cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, Scott in fact furthered the very goals that the Commission wishes to promote.

Accordingly, we hold that the Commission could not constitutionally reprimand Scott for making public statements critical of the court-at-law and the district attorney's office, and we remand so that the district court may direct the Commission to expunge the third paragraph of the reprimand, dealing with those statements, from Scott's record and for entry of an appropriate declaratory judgment.[24]

We remand also in order that the court may consider an award of attorneys' fees pursuant to section 1988. Any such award, however, must be paid by the state and cannot be assessed against the defendants in their individual capacity, as the injunctive relief sought and won by Scott can be obtained from the defendants only in their official capacity as commissioners.[25]

The judgment is REVERSED and REMANDED for further proceedings consistent herewith.

GARWOOD, Circuit Judge, dissenting:

I respectfully dissent from the majority's holding that this case is not governed by *Thomas v. Kadish,* 748 F.2d 276 (5th Cir. 1984), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).[26] The majority distinguishes *Thomas* on two grounds. In my opinion, neither is substantial.

First, the majority contends that in *Thomas,* the Texas Board of Law Examiners (the Board) was essentially an agent of the Texas Supreme Court, while here the Texas Commission on Judicial Conduct (the

**23.** *See Rankin,* 483 U.S. at 388, 107 S.Ct. at 2898 ("The State bears a burden of justifying ... [its action] on legitimate grounds.")

**24.** We emphasize that our holding is limited to the narrow question before us, which is whether a judge can be reprimanded for publicly commenting upon the administration of justice as it relates to cases that pass through his court. Restrictions are regularly placed upon judges' expression of views on issues of public concern that do not involve the legal system, e.g., nuclear proliferation, the budget deficit, and environmental quality, and we intimate no opinion as to the permissible extent of such proscriptions.

**25.** There is, of course, no eleventh amendment obstacle to the award of attorneys' fees against a state pursuant to § 1988. *Hutto v. Finney,* 437 U.S. 678, 693–700, 98 S.Ct. 2565, 2574–79, 57 L.Ed.2d 522 (1978). In this regard, we very much question the inclusion of the commissioners as defendants in their *individual* capacity. Here, no monetary damages, but only equitable relief, was sought. The commissioners can expunge the subject language from the reprimand only while acting in their official capacity. Hence, there is no basis for suit against them as individuals.

When questioned on this matter at oral argument, Scott's attorney stated that suit was brought against the individuals "out of an abundance of caution" to ensure the availability of attorneys' fees. However, as we have stated, *Hutto* undeniably authorizes attorneys' fees against the state where officials are sued in their official capacity. Thus, suit against individuals without basis can be abusive, in some cases, and, where appropriate, could subject plaintiffs and their counsel to sanctions under Fed.R. Civ.P. 11, especially where such defendants are forced to hire separate counsel in their individual capacity or are subjected, as individuals, to vexatious litigation.

No such inconvenience was visited upon the instant defendants, however. And we do not wish unduly to chastise plaintiffs' counsel in this case, who have prosecuted this matter with professionalism and skill. Heretofore, such suits against defendants in both capacities, presumably out of "an abundance of caution," have not been uncommon. But we caution future litigants and their attorneys that defendants should not be sued individually unless there is a good-faith basis for liability against them in that capacity.

**26.** Following oral argument, we asked the parties to brief that issue, and in their brief appellees have contended that this suit is barred under the doctrine of *Thomas.*

Commission), according to the majority, is "largely independent of the state courts" and "cannot be viewed as their agent." In this respect, however, the majority ignores the intimate relationship of the Commission to the Texas Supreme Court specifically and to the Texas judiciary in general. The Commission is provided for by Article V, § 1–a, of the Texas Constitution, Article V being the article of the Texas Constitution devoted to "the judicial department." The only business of the Commission is dealing with the State's judiciary; it has no other function. Further, its relationship to the Texas Supreme Court is extremely close. Section 1–a(11) provides that "[t]he Supreme Court shall by rule provide for the procedure before the Commission" and section 1–a(9) provides that any public censure, retirement, or removal decision is subject to ultimate review by the Texas Supreme Court. Of the Commission's eleven members, five are judges appointed by the Texas Supreme Court, and two are lawyers appointed by the Board of Directors of the State Bar of Texas. Art. V, § 1–a(2). The State Bar of Texas is, itself, in large measure controlled by the Texas Supreme Court.[27]

Moreover, it is questionable whether *Thomas* can properly be understood as resting on the proposition that the Board's there complained of decision was in substance the decision of the Texas Supreme Court. It evidently was not that Court's decision, because under Texas law the plaintiff there had the right to "obtain judicial review by filing suit in a specified [state] district court." *Thomas,* 748 F.2d at 280. If the complained of decision in *Thomas* had in substance been that of the Texas Supreme Court, it obviously would not have been subject to review in the state district court.

The majority concedes that the Commission in this instance was acting in a judicial capacity, and that its reprimand of Scott "was a judicial act." Given this, and the nature of the Commission, it seems to me that the Commission here in substance functioned as a court. *See Prentis v. Atlantic Coast Line Co.,* 211 U.S. 210, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908) (assuming, *arguendo,* that State Corporation Commission could be a court if its action had been judicial in nature, in which event it "would be protected from interference on the part of courts of the United States"); *New Orleans Public Service, Inc. v. Council of City of New Orleans,* —— U.S. ——, 109 S.Ct. 2506, 2519–20, 105 L.Ed.2d 298 (1989) (discussing *Prentis* and *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). *See also North Pacific S.S. Co. v. Industrial Accident Commission,* 23 F.2d 109 (D.Cal.1918) (State Industrial Accident Commission is a court).

The other ground on which the majority relies to distinguish *Thomas* is that here there was no express statutory or constitutional provision for review of the Commission's reprimand,[28] while in *Thomas* the relevant State Bar rule expressly allowed review by suit in a specified state district court. The majority takes the view that Scott had no vehicle other than a suit (in federal or state court) under 42 U.S.C. § 1983 to challenge the Commission's action. This is incorrect, inasmuch as Texas law provided Scott with an implied right of appeal to the Texas district courts (with review in the state appellate courts) to raise any *state* (or federal) constitutional challenge to the action in question. *See, e.g., City of Amarillo v. Hancock,* 150 Tex.

---

**27.** Texas Gov't Code Ann., § 81.011, provides:

"(a) The state bar is a public corporation and an administrative agency of the judicial department of government.

"(b) This chapter is in aid of the judicial department's powers under the constitution to regulate the practice of law, and not to the exclusion of those powers.

"(c) The Supreme Court of Texas, on behalf of the judicial department, shall exercise administrative control over the state bar under this chapter."

*See also id.,* § 81.024(a) ("The supreme court shall promulgate the rules governing the state bar....").

**28.** Had the action against Scott been a formal public censure or order for suspension, removal, or retirement, it would have been subject to express provision for various stages of review, ultimately culminating in the Texas Supreme Court. Tex. Const. Art. V, § 1–a(6), (8), (9).

231, 239 S.W.2d 788 (1951).[29] Accordingly, Scott, just like the plaintiff in *Thomas*, had available to him, but chose not to utilize, a state law-based suit in the state district court, not under section 1983, to challenge the complained of action. Thus, the majority's second ground for distinguishing *Thomas* is insubstantial. Further, in any event, it would appear that, even if a *Hancock* action were not available or were to be viewed as collateral in nature, nevertheless the Commission in the instant case was acting as a court and review of its decision could be had directly in the United States Supreme Court.

Accordingly, I conclude that Scott's section 1983 suit was barred under the rationale of *Thomas*.

As the majority reaches the merits, I will briefly comment in that respect also. It must be understood that as this case comes to us, Scott does not challenge the Commission's reprimand. All he wants is a portion of the reasons for that reprimand deleted. When the district court decided this case, Scott no longer held any judicial, or other public, office whatever, nor has he at any time since then.[30] It is undisputed that neither the Commission's reprimand nor the challenged portion thereof had any legal effect whatever on Scott, either individually or in his position as justice of the peace. It did not in any way restrict any of his personal or official rights or powers, or put him under any legal disability whatever. It did not affect his conditions of employment. The Commission did not order Scott to do or refrain from doing anything. It did not make him eligible for other action

by the Commission that he would not have been legally eligible for or subject to had this reprimand not been entered or had it not included the complained of language. The Commission's complained of action amounted in substance to nothing more than the expression of its opinion that what Scott did was "improper" because it tended to be "destructive of public confidence in the judiciary." As the majority points out, Scott was an independent, elected public judicial officer, and was not an employee of the Commission or of any other state official, agency, or court.

I would not reach the question of whether Scott's First Amendment rights would have been violated had the Commission taken some action which materially and adversely altered Scott's conditions of employment or which placed Scott, individually or in his former position as justice of the peace, under some legal disability, or caused him in either capacity to lose legal rights he would otherwise have had, or to be legally subject to some sort of adverse consequence of which he would otherwise have been legally free. Clearly, if stated by a private individual, the challenged portion of the Commission's reprimand would have been that character of pure expression of opinion which the First Amendment protects against libel and slander claims. *See Milkovich v. Lorain Journal Co.,* —— U.S. ——, ——, 110 S.Ct. 2695, 2706, 111 L.Ed.2d 1 (1990).[31] Scott does not claim that in this respect the Commission made or in any way implied any misstatement of fact. He merely quarrels with its opinion that his undisputed conduct was "improp-

---

**29.** Scott admits the availability of review under *Hancock,* as he states in his initial brief in this Court:

> "He [Scott] could have brought that challenge in state court, *either* under 42 U.S.C. § 1983, ... *or* under the Texas state court's inherent right to review the constitutionality of administrative actions, *Hancock v. City of Amarillo* [*City of Amarillo v. Hancock,* 150 Tex. 231], 239 S.W.2d 788 (Tex.1951)...." (Emphasis added.)

**30.** Scott went out of office sometime before April 1986. Scott has advised us, however, that he intends to be an independent candidate for judge of a Texas court of appeals in the 1990 general election. As of the time that Scott so informed this Court, he had not yet qualified as

such a candidate, and whether he has done so since then is unclear.

Under the circumstances, Scott has no standing to seek declaratory or injunctive relief in respect to his future conduct as an appellate judge, *see Brown v. Edwards,* 721 F.2d 1442, 1446–47 (5th Cir.1984), and in any event this suit in its present posture does not seek such relief. Scott seeks no damages.

**31.** In *Milkovich,* the Court recognized "that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection," as will also "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Id.* ——

er" because it tended to be "destructive of public confidence in the judiciary." Even a factually false libelous official statement by a governmental actor does not invade a liberty interest where it has no legal consequences and is not made in connection with termination of (or similar adverse change in conditions of) governmental employment. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 1161–64, 47 L.Ed.2d 405 (1976). Whether or not the rule of *Paul v. Davis* would carry over to First Amendment claims need not be resolved for, as noted, here there is in substance nothing but the expression of opinion, which itself would be constitutionally protected on the part of nongovernmental actors.

Whether one views Scott as not having been legally "injured" or suffered a "deprivation" under section 1983, or whether one reads the First Amendment as not forbidding governmental actors from merely stating their opinion, with no factually false connotations, concerning the impropriety of the way in which some other governmental official may have previously exercised his First Amendment rights, is not important in the present context. One approach or the other is called for here, and under either Scott's present section 1983 claim should fail.[32]

Accordingly, I respectfully dissent.

---

U.S. at ——, 110 S.Ct. at 2706 (footnote omitted).

**32.** I am aware of the passage in footnote 8 of *Rutan v. Republican Party of Illinois,* —— U.S. ——, —— n. 8, 110 S.Ct. 2729, 2738 n. 8, 111 L.Ed.2d 52 (1990), where the Court observed:

> "Moreover, the First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights.'"

In this passage, the Supreme Court was quoting from the decision below of the Seventh Circuit in *Rutan v. Republican Party of Illinois,* 868 F.2d 943, 954 n. 4 (7th Cir.1989), where the Seventh Circuit in turn was characterizing its decision in *Bart v. Telford,* 677 F.2d 622 (7th Cir.1982).

Actually, *Bart* held no such thing. To the contrary, *Bart* clearly implied that such trivial action as failing to hold a birthday party *would not* of itself be actionable under section 1983, even if taken in retaliation for the exercise of First Amendment rights. *Bart,* at 625. Rather, *Bart* held that the complaint was sufficient because it alleged "an entire campaign of harassment which though trivial in detail may have been substantial in gross. It is a question of fact whether the campaign reached the threshold of actionability under section 1983." *Id.* I believe it would be a serious mistake to take literally the Supreme Court's apparently offhand dicta about birthday parties in footnote 8 of *Rutan.* In the body of the opinion in *Rutan,* the Court stressed that the case before it involved "significant penalties ... imposed for the exercise of rights guaranteed by the First Amendment." —— U.S. at ——, 110 S.Ct. at 2736. Nothing of that kind is involved here.