876 So.2d 1006 (2004)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Connie Glen WILKERSON.
No. 2002-JP-02105-SCT.
Supreme Court of Mississippi.
July 1, 2004.
*1008 Luther T. Brantley, III, attorney for appellant.
Stephen Crampton, Michael J. Deprimo, Tupelo, attorneys for appellee.
EN BANC.
DICKINSON, Justice, for the Court.
¶ 1. In the case before us, the Mississippi Commission on Judicial Performance asks us to sanction a judge for his extra-judicial public statements of his views on the rights of gays and lesbians. We decline to do so and dismiss the Commission's complaint. This is a case of first impression.

FACTS
¶ 2. After reading an article about certain states which have chosen to extend to homosexual partners the same right to sue previously reserved for spouses and family members, George County Justice Court Judge Connie Glen Wilkerson felt compelled to make known his disagreement with those states, and his views on homosexuality in general. The judge sent a letter to the editor of his local weekly newspaper, The George County Times, which he signed "Connie Glenn Wilkerson" and stamped "Bro. Connie G. Wilkerson." The letter provided his home address and telephone number, and provided no reference to his official capacity as a judge.
¶ 3. Declaring that his views were based on his Christian beliefs, and upon Biblical principles, the judge opined that homosexuals belong in mental institutions. The letter was published on March 28, 2002.
¶ 4. On April 9, 2002, a reporter from a radio network called the judge at home to discuss the letter. The judge contends that the reporter encouraged him to repeat his views on the legislation and homosexuality and that the conversation was aired without his permission.
¶ 5. In the interview he referred to homosexuality as an "illness" which merited treatment, rather than punishment. He faults the radio network for airing the recorded statements which the radio station "unfairly interspersed" with comments from known homosexual activists.
¶ 6. In response to a complaint filed by Lambda Legal, the Mississippi Commission on Judicial Performance charged the Judge with:
1. "willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute," in violation *1009 of Article 6, § 177A of the Mississippi Constitution of 1890;
2. breach of Canons 1, 2A, 3A(1), 4A and 5A of the Code of Judicial Conduct of Mississippi (hereinafter the "Code") for his conduct in writing the letter; and
3. violation of Canons 1, 2A, 3B(2), (5) and (9) and 4A and 4B of the Code.
¶ 7. The sole issue before us is whether the judge's right to send the letter and make the statements are protected by the First Amendment to the United States Constitution.[1]
¶ 8. To be sure, we affirm our reverence for the judicial oath of office and the Canons which govern judicial conduct. This certainly includes Canon 4A(1), which requires judges to "conduct all extra-judicial activities so that they do not cast doubt on the judge's capacity to act impartially as a judge."
¶ 9. Today's decision does not void, amend or diminish any of the Canons found in our Code of Judicial Conduct, nor does it bring into question the validity of any of our firmly held beliefs regarding a judge's obligation to foster respect for, and bring honor to, the judiciary and to the legal profession, generally.
¶ 10. Nevertheless, because we are convinced that the statements made by the judge in this case constitute religious and political/public issue speech specially protected by the First Amendment and because we are further persuaded that in some cases (including the case sub judice), forced concealment of views on political/public issues serves to further no compelling governmental, public or judicial interest, we are compelled to reject the recommendation of the Commission and hold that  under the particular facts of this case  sanctions are constitutionally impermissible.

ANALYSIS
¶ 11. Article 6, Section 177A of the Mississippi Constitution charges the Commission with the responsibility of making recommendations to the Supreme Court for discipline of judges, including public censure. In practice, the Commission investigates complaints filed against judges, and makes its recommendations to the Supreme Court in the form of a findings of fact, conclusions of law, and recommendations.
¶ 12. According to the Commission Findings of Fact, Conclusions of Law and Recommendation in this case, the offending statement attributed to the judge was contained in a letter to the editor of The George County Times. The letter stated, in part:
... the California legislature enacted a law granting gay partners the same right to sue as spouses or family members.... In my opinion, gays and lesbians should be put in some type of mental institute instead of having a law like this passed for them....
¶ 13. This statement, according to the Commission, violates Canon 4(A)(1) and, therefore, constitutes "willful misconduct in office" and "conduct prejudicial to the administration of justice which brings the judicial office into disrepute."
¶ 14. The rules (or Canons) of conduct which govern judges in Mississippi are found in the Mississippi Code of Judicial *1010 Conduct ("MCJC"). On April 4, 2002, This Court revised the MCJC, replacing the previous code which had been in effect since 1995. According to the Commission's Findings, the judge in this case "wrote a letter and sent same to the editor of The George County Times newspaper which was published on March 28, 2002." Thus, the letter complained of predates the promulgation of Canon 4(A)(1), and is not subject to it. Nevertheless, the Commission found that the judge "violated Canon 4(A)(1) in allowing his extra-judicial conduct to cast a reasonable doubt on the judge's capacity to act impartially as a judge."
¶ 15. One might think that, since the judge's letter was not subject to review under Canon 4(A)(1), the inquiry concerning the letter should now end. However, this Court is the ultimate trier of fact, and is charged with the obligation to conduct an independent inquiry in judicial misconduct proceedings. Miss. Comm'n on Judicial Performance v. Fletcher, 686 So.2d 1075, 1078 (Miss.1996).[2] In fulfilling that responsibility, this Court must determine whether the judge's statements in the letter and subsequent interview with a reporter, violated the Canons, irrespective of the Commission's Findings.
¶ 16. On March 28, 2002 (the date the letter was published), the only Canon which would apply to the statement in the letter was Canon 2(A) of the Code provided:
A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
¶ 17. In its complaint against the judge, the Commission charges a violation of this Canon. Therefore, the statement in the letter should be analyzed under this previous Canon.
¶ 18. On April 4, 2002, new Canons (including Canon 4(A)(1)) were adopted and became applicable. Shortly thereafter, the judge repeated the statement in an interview on public radio. Thus, the radio interview should be analyzed under Canon 4(A)(1). However, since both canons must be analyzed under the "strict scrutiny" test as discussed supra, we will make no distinction, and refer to both canons as the "Canon."

THE CONSTITUTIONAL ISSUES
¶ 19. The Canons which guide the conduct of our judges are a necessary and critical part of our judicial system. Disregard for the Canons leads inexorably to disrespect for the judiciary. We regard as a primary obligation of this Court the vigilant promotion of judicial ethics, which can only be accomplished by strict enforcement of the Canons. However, this Court clearly may not impose sanctions for violation of a Canon where doing so would infringe on rights guaranteed under the First Amendment, including the freedom of speech. ¶ Clearly, the government may  in certain circumstances  restrict the freedom of speech. When it proposes to do so, however, it must have a good reason. There are several different classifications of speech which, because of their various levels of importance to society, enjoy different levels of constitutional protection. As the levels of importance increase, the government's burden to justify the restriction becomes more difficult. For instance, *1011 "commercial speech," which usually involves advertising products for sale, may not be restricted unless the government can demonstrate a "substantial interest" to be achieved in the regulation. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n., 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). The state's burden in meeting the "substantial interest" test for commercial speech is not as difficult as the "compelling state interest" test required for political/public issue, or religious speech.

Political/Public Issue Speech.
¶ 20. The United States Supreme Court has held and "frequently reaffirmed that speech on political views and public issues occupies the `highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 1689, 75 L.Ed.2d 708 (1983) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982); Carey v. Brown, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)).
¶ 21. Where the government seeks to restrain political/public issue speech, it must withstand "strict scrutiny," which requires the government to demonstrate that the restraint "is (1) narrowly tailored to serve (2) a compelling state interest." Republican Party of Minnesota v. White, 536 U.S. 765, 774-75, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (emphasis added). A prior restraint is narrowly tailored where "it does not `unnecessarily circumscrib[e] protected expression'." Id. (quoting Brown v. Hartlage, 456 U.S. 45, 54, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982)).
¶ 22. Obviously, the state will have more difficulty demonstrating a "compelling state interest" (as required for political/public issue speech), than a "substantial interest" (as required for commercial speech). It is therefore important in the first instance to determine the category of speech the government seeks to restrain.

Gay Rights is a political/public issue.
¶ 23. It is hardly debatable that the extension of certain rights to gays and lesbians has become an important political public issue. Numerous states, including Mississippi, have passed laws prohibiting the marriage of gay partners. See Miss.Code Ann. § 93-1-1(2). Some state officials have openly defied the laws of their respective states and allowed gay couples to marry. There is even a movement to amend the United States Constitution to define marriage as a union between a man and a woman. Lambda Legal, the organization which filed the complaint in the case sub judice, is a political organization which works to establish and increase the rights for gays and lesbians. Thus, the case before us unquestionably involves political/public interest speech. In applying the requirements of the Constitution to the facts of this case, we will first look to other jurisdictions for guidance.
¶ 24. In a case with similar facts, justice of the peace James Scott was disturbed about what he considered to be "injustice" in the administration of the judicial system in his county. Scott v. Flowers, 910 F.2d 201 (5th Cir.1990). Judge Scott wrote an open letter to county officials in which he accused the "county court at law court and the district attorney's office" of "adversely affect[ing] justice in [his] county." Id. at 203. The judge's letter was "circulated to the local press" and attracted a great deal of attention from citizens, judges and eventually the Texas Commission on Judicial Performance, which issued Judge Scott a public reprimand. Id. at 204. The Texas Commission justified the reprimand by holding that Judge Scott's conduct served only to *1012 "cast public discredit upon the judiciary." The Texas Commission ordered Judge Scott to show more restraint in future oral and written communications. Id.
¶ 25. Judge Scott filed suit, challenging the Commission's reprimand as an unconstitutional restraint of his freedom of speech, guaranteed by the First Amendment to the United States Constitution. The United States District Court granted summary judgment to the Texas Commission. The United States Court of Appeals for the Fifth Circuit reversed, holding that the reprimand violated Judge Scott's First Amendment rights. The following excerpt from Scott is particularly applicable and instructive:
[W]e have recognized that the state may restrict the speech of elected judges in ways that it may not restrict the speech of other elected officials. In Morial v. Judiciary Comm'n of La., 565 F.2d 295, 301 (5th Cir.1977) (en banc), cert. denied, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978)), we upheld a state statute requiring judges to resign from the bench before declaring their candidacy for an elective non-judicial office and explained that the state may regulate the speech of judges in order to preserve the impartiality of the judicial branch....
We were careful to note, however, that our holding in Morial was a narrow one, turning on the fact that the resign-to-run statute, and restrictions on judicial campaign promises, were fairly limited intrusions into the political speech of elected judges. That is, "Louisiana's resign-to-run requirement does not burden the plaintiff's right to vote for the candidate of his choice or to make statements regarding his private opinions on public issues outside a campaign context; nor does it penalize his belief in any particular idea. These are core first amendment values." Id. at 301 (emphasis added).
Unlike the statute upheld in Morial, the reprimand of Scott does infringe upon the right "to make statements... on public issues outside a campaign context" and thus touches upon "core first amendment values." Accordingly, the Commission must carry a very difficult burden in order to demonstrate that its concededly legitimate interest in protecting the efficiency and impartiality of the state judicial system outweighs Scott's first amendment rights.
We conclude that the Commission has failed to carry that burden. Neither in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary, and we are unpersuaded that they would have such a detrimental effect. Instead, we believe that those interests are ill served by casting a cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, Scott in fact furthered the very goals that the Commission wishes to promote.
Scott, 910 F.2d at 212-13 (emphasis added).
¶ 26. The Scott court pointed out that, although the courts at one time[3] condoned *1013 the right of the state as an employer to restrict free speech,
the Court has [since] rejected that approach in favor of one recognizing that public employees do not shed constitutional protection when they enter the workplace but nevertheless balances those employees' rights against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."
Id. at 210, citing Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).
¶ 27. In another case involving a judge who made a speech at a pro-life rally, the Supreme Court of Washington stated that "[a] judge does not surrender First Amendment rights upon becoming a member of the judiciary," and "[i]f a person does not completely surrender his or her right to freedom of speech upon becoming a candidate, then we cannot expect the candidate to do so once elected to judicial office." In re Sanders, 135 Wash.2d 175, 188-89, 955 P.2d 369, 375 (1998).
¶ 28. Here, Judge Wilkerson expressed his views on a political/public interest issue  the rights of gays and lesbians. We therefore may not impose sanctions unless we conclude, under the specific facts of this case, that the restraint the Commission seeks to enforce is "narrowly tailored" to achieve a "compelling state interest." It seems to us difficult to conclude that discussion of the rights of gays poses more of a threat to judicial integrity than Judge Scott's direct criticism of the judicial system itself. Stated another way, we find the integrity of the judiciary less threatened by Judge Wilkerson's statements about gays than by Judge Scott's constitutionally-protected statements which directly criticized the integrity of the judiciary.

Religious Speech.
¶ 29. We also face the question of whether the judge's statements were protected religious speech. Private religious speech is as fully protected under the First Amendment as secular private expression. Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), citing Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); Board of Ed. of Westside Community Schools (Dist.66) v. Mergens, 496 U.S. 226, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990); Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); Heffron v. International Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981).
¶ 30. The Supreme Court has further stated: "Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince." Pinette, 515 U.S. at 760, 115 S.Ct. at 2446.
¶ 31. In the case sub judice, Judge Wilkerson framed and supported his opinion and statements with his personal religious beliefs. His letter published in The George County Times, stated that his "reason for responding" to the story about the California Legislature was "the last verse of chapter one of the book of Romans in our HOLY BIBLE." He went further to state that "[y]ou need to know as I know that God in Heaven is not pleased with this, and I am sounding the alarm that I, for one, am against it and want our LORD to see and hear me say I am against it."
¶ 32. In his radio interview with PRM, Judge Wilkerson stated that he signed his letter as a "Christian man." When the radio announcer observed that Judge *1014 Wilkerson based his views on "deeply held religious beliefs," Judge Wilkerson responded:
Here's where I'm coming from. Now if the Holy Bible's true, the King James Bible, which as a Christian man, I'd say every word from Genesis to Revelation is true, then God didn't put up with it in Sodom and Gomorrah, and that's the part that worries me, you know.
¶ 33. There are millions of citizens who believe Judge Wilkerson's religious views are exactly correct. There are still millions more who find his views insulting. Whether he is right is not the issue here. It is, rather, whether this Court can  consistent with the First Amendment  prevent Judge Wilkerson from publicly stating these religious views. We hold that, under the facts of this case, we cannot.

Prior Restraint.
¶ 34. The Canon, as applied to Judge Wilkerson in this case, constitutes a prior restraint on his right to publicly state his political and religious views. There is a heavy presumption that every prior restraint on protected speech is unconstitutional. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975).
¶ 35. The Supreme Court of Appeals of West Virginia, facing a similar constitutional question, clearly defined the issue before us:
Admittedly, the Judge's comments created a storm of controversy and were not appreciated by many of the listeners, but it is in that context that the First Amendment plays its most important function. See Waters v. Churchill, 511 U.S. 661, 672, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686, 697 (1994), quoting Cohen v. California, 403 U.S. 15,24-25,91 S.Ct. 1780, 1788 29 L.Ed.2d 284, 293 (1971) ("The First Amendment demands a tolerance of `verbal tumult, discord, and even offensive utterance, `as' necessary side effects of ... the process of open debate'"); Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896 93 L.Ed. 1331, 1134 (1949) ("A function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging"). The comments of the Judge cannot be construed as a physical or otherwise improper threat against the targets. The Judge's commentary thus clearly falls within protected speech and need not be punished in order to maintain the purposes of the judicial canons. As often proved in this State, judges (like anyone else) have a right to be obnoxious in their public expression. They may continue to offend, so long as they refrain from violating specific provision of the Code or some other law. While offensive expression may rise questions about the speaker's temperament and discretion, the Constitution requires that those questions must be answered by the public through the ballot box and not be this Court through disciplinary proceedings. The Special Judicial Hearing Board correctly recommended the dismissal of this complaint.

In re Hey, 192 W.Va. 221, 452 S.E.2d 24, 33-34 (1994) (bracketed material & emphasis added).

Achieving a Compelling Governmental Interest.
¶ 36. As already stated, the state's burden here is to demonstrate that a "compelling state interest" will be achieved by applying the Canon to sanction judges who speak their views about *1015 gay rights. Even our Founders were well aware that the government cannot always be trusted to accurately discern what is, and is not, a compelling state interest. Indeed, the primary reason we have the First Amendment to our Constitution is that our Founders did not trust the government to always protect the rights of the people against the powers of the government. Many states refused to ratify the Constitution without a Bill of Rights, granting the citizens protection from the government. Perhaps Justice Stevens said it best when he declared for the Court: "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 503, 116 S.Ct. 1495, 1508, 134 L.Ed.2d 711 (1996).
¶ 37. Judge Wilkerson challenged the Commission to articulate the "compelling state interest" in sanctioning judges who announce their private views on gay rights. The Commission's only attempt to do so was in its brief filed with this Court, wherein it pointed out that impartiality of the judiciary is a compelling state interest, and that "impartiality" means "the lack of bias for or against (sic) either party to the proceeding."
¶ 38. We agree that the Commission articulated a compelling state interest: "impartiality of the judiciary." However, the task is not finished. Having articulated a "compelling state interest," the Commission must next demonstrate how preventing judges from announcing their views on gay rights will serve to achieve that "compelling state interest." This it never did. Instead, it equated "impartiality of the judiciary" with "the appearance of impartiality of the judiciary."
¶ 39. No credible person could dispute that having impartial judges is a compelling state interest. But "impartiality" is not the same as the "appearance of impartiality."[4] We find no compelling state interest in requiring a partial judge to keep quiet about his prejudice so that he or she will appear impartial.
¶ 40. Whatever state interest the Commission may find in preventing judges from announcing their private views on gay rights would conflict with, and be outweighed by, the more compelling state interest of providing an impartial court for all litigants, including gays and lesbians. Allowing  that is to say, forcing  judges to conceal their prejudice against gays and lesbians would surely lead to trials with unsuspecting gays or lesbians appearing before a partial judge. Unaware of the prejudice and not knowing that they should seek recusal, this surely would not work to provide a fair and impartial court to those litigants.

Recusal.
¶ 41. We feel obliged to point out that, having publicly expressed his view that "gays and lesbians should be put in some type of mental institute," Judge Wilkerson will doubtless face a recusal motion from every gay and lesbian citizen who visits his court. We can predict that the rationale for the motions will be that Judge Wilkerson is prejudiced against gays and lesbians, and he has a preconceived belief that their mental capacity as a class of people is inferior to society in general. Judge Wilkerson, on the other hand, may believe he can be fair to gays and lesbians in his court. Thus, in publicly announcing views which  although constitutionally allowed  *1016 nevertheless cast doubt on his impartiality, Judge Wilkerson has created a paradox for himself. Even if he feels it is his duty to refuse to recuse; yet, should he deny the recusal motions, he faces a substantial risk of future complaints with the Commission. We express no opinion here as to the outcome of such complaints, as the issue is not before us today.

CONCLUSION
¶ 42. We endorse the Canons, and we certainly endorse the promotion of an impartial judiciary. We also find, however, that the objects of judicial prejudice are entitled to seek a level playing field through recusal motions, and citizens who disagree with a judge's views are entitled to voice their disagreement at the ballot box. These legitimate interests are frustrated when prejudice is hidden.
¶ 43. There is an old Malayan proverb which states: "Don't think there are no crocodiles because the water is calm." This teaching is applicable to the case sub judice, because Commission urges us to "calm the waters" when, as the guardians of this state's judicial system, we should be helping our citizens to spot the crocodiles.
¶ 44. For the reasons stated herein, we find the judge may not be sanctioned for his statements which are protected by the First Amendment to the United States Constitution. We reject the Commission's findings and recommendation, and we finally dismiss the Commission's complaint and this case with prejudice.
¶ 45. DISMISSED WITH PREJUDICE.
SMITH, C.J., WALLER, P.J., EASLEY AND RANDOLPH, JJ., CONCUR. RANDOLPH, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, P.J., EASLEY AND DICKINSON, JJ. CARLSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, J. COBB, P.J., AND DIAZ, J., NOT PARTICIPATING.
RANDOLPH, Justice, specially concurring.
¶ 46. Today this Court is faced with a conflict between the First Amendment right to free speech and our Code of Judicial Conduct. When such conflict arises, certainly the fundamental constitutional right must prevail. That said, I am compelled to write.
¶ 47. We know and accept that our body of law is structured in a hierarchy. First and foremost, there is the U.S. Constitution followed by the Mississippi Constitution. Next comes the statutes as passed by our legislative body, and finally the rules of court and rules of conduct. Limitations provided in the Code of Judicial Conduct cannot trump the dearly held and protected rights guaranteed by our U.S. and Mississippi Constitutions.
¶ 48. Second, no matter how outrageous some may find the comments at issue here, we should not forget that content-based restrictions on speech are generally abhorred under our jurisprudence. In a concurring opinion for the Supreme Court, Justice Kennedy noted:
"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." Police Dept. of Chicago v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). See also Ragland, 481 U.S., at 229-230, 107 S.Ct., at 1727-1728 (citing Mosley); Regan v. Time, Inc., 468 U.S. 641, 648-649, 104 S.Ct. 3262, 3266-3267, 82 L.Ed.2d 487 (1984) ("Regulations which permit the Government to discriminate on the basis *1017 of the content of the message cannot be tolerated under the First Amendment").
Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd., 502 U.S. 105, 126, 112 S.Ct. 501, 514, 116 L.Ed.2d 476 (1991) (Kennedy, J., concurring).
¶ 49. Accordingly, I agree with the majority.
SMITH, C.J., WALLER, P.J., EASLEY AND DICKINSON, JJ., JOIN THIS OPINION.
CARLSON, Justice, dissenting.
¶ 50. Because the majority fails to sanction a judge who freely chose to write a letter to the editor for publication in the local George County newspaper, and then later chose to submit to an interview with a reporter from Mississippi Public Radio (PRM)[5], all to express his views on homosexuality, and evidently for no apparent reason other than he just felt like it, I must respectfully, but yet vigorously dissent.
¶ 51. One point must be made unmistakably clear at the outset. This is not a gay-rights case.
¶ 52. Not one word contained in the majority opinion or this dissent in any way infers that this is about gay-rights, or that any justice on this Court is attempting to take a stand on this highly emotionally-charged international social/religious issue. What this case is about is the obligation of this Court in behalf of our citizens to demand of our judges at every level in our Mississippi court system, including the members of this Court, exemplary conduct which is above and beyond that expected of other citizens in our society.
¶ 53. The majority concludes that the statements made by the judge were protected religious and political/public speech under the First Amendment to the United States Constitution. Therefore, the majority holds that the Canons found in the Code of Judicial Conduct (the "Code") may not be enforced based on this judge's actions. Because I would find that this speech is not protected because it does not meet the requirements of the two-prong test set out in Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), I would sanction the judge for his letter to the editor and his statements made to the press.
¶ 54. The findings and conclusions of the Commission on Judicial Performance are considered de novo by this Court. Miss. Comm'n on Judicial Performance v. Boykin, 763 So.2d 872, 874 (Miss.2000) (citing Miss. Comm'n on Judicial Performance v. Gunn, 614 So.2d 387, 389 (Miss.1993)). The Commission's findings based on clear and convincing evidence are given "great deference." Id. However, this Court is obligated to conduct an independent inquiry. Miss. Comm'n on Judicial Performance v. Neal, 774 So.2d 414, 416 (Miss.2000). Even though we consider the Commission's findings, they are not binding and additional sanctions may be imposed. Miss. Comm'n on Judicial Performance v. Whitten, 687 So.2d 744, 746 (Miss.1997).
¶ 55. The primary purpose of judicial sanctions is not punishment of the individual judge but "to restore and maintain the dignity and honor of the judicial office and to protect the public against future excesses." Miss. Comm'n on Judicial Performance v. Guest, 717 So.2d 325 (Miss 1998) (citing In re Harned, 357 N.W.2d 300, 302 *1018 (Iowa 1984)). This Court has also discerned that "the official integrity of the justice court judges is vitally important, for it is on that level that most citizens have their only experience with the judiciary." Guest, 717 So.2d at 329 (citing Gunn, 614 So.2d at 389; In re Garner, 466 So.2d 884, 887 (Miss.1985)). "It is imperative for justice court judges to conduct themselves with the utmost diligence in order to uphold the public's confidence." Guest, 717 So.2d at 329 (citing Whitten, 687 So.2d at 748 (quoting Gunn, 614 So.2d at 389-90)).
¶ 56. An understanding of the Code of Judicial Conduct is properly guided by the first two introductory Canons. Although the Code was substantially revised on April 4, 2002, both Canon 1 and Canon 2 are virtually unchanged. Canon 1 requires that "A Judge Should Uphold the Integrity and Independence of the Judiciary" and commands that:
[a]n independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.[6]
Canon 2 charges all judges to avoid impropriety and the appearance of impropriety in all activities. Most important is the charge for judges to respect and comply with the law and conduct themselves in a manner that promotes public confidence in the integrity and impartiality of the judiciary. The Commentary to Canon 2A embodies the admonition that:
[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and do so freely and willingly.

(emphasis added).
¶ 57. Canon 4A(1), as amended on April 4, 2002, is entitled "A Judge May Engage in Activities to Improve the Law, the Legal System, and the Administration of Justice" and mandates that judges conduct their extrajudicial activities as to minimize the risk of conflict with their judicial obligations. A judge's conduct must not cast reasonable doubt on the judge's capacity to act impartially as a judge. The comment to Canon 4A was amended to further explain:
Expressions of bias or prejudice by a judge, even outside the judge's judicial activities may cast reasonable doubt on the judge's capacity to act impartially as a judge. Expressions which may do so include jokes or other remarks demeaning individuals on the basis of their race, gender, religion, national origin, disability, age, sexual orientation or socioeconomic status.
While only recently amended to specifically mention expressions relating to race, gender, religion, national origin, disability, age, sexual orientation or socioeconomic status, the purpose and mandate of the Code has not changed. Even though the language is new, the Code has always prohibited statements such as these because *1019 they justify a public perception of judicial bias. Even prior to the revisions, such statements were condemned in Canon 2A by the requirement that judges conduct themselves "at all times in a manner that promotes public confidence in the integrity of and impartiality of the judiciary." Miss.Code of Jud. Conduct, Canon 2A (1999). Likewise, prior to the revisions, Canon 5 mandated that judges regulate their extra-judicial activities, including writing and public speaking, so as to minimize the risk of conflict with their judicial duties. Miss.Code of Jud. Conduct, Canon 5 (1999).
¶ 58. With this forethought, the Commission charged the Judge with "willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute," in violation of Article 6, § 177A of the Mississippi Constitution of 1890. Additionally, the Commission charged him with breach of Canons 1, 2A, 3A(1), 4A and 5A of the Code for his conduct in writing the letter. Further, the Commission charged that the Judge's conduct and comments during the radio interview violated Canons 1, 2A, 3B(2), (5) and (9) and 4A and 4B of the Code.
¶ 59. Even when not on the bench or acting in an official capacity, a judge's actions may be sanctionable under Section 177A. Miss. Comm'n on Judicial Performance v. Thomas, 549 So.2d 962, 965 (Miss.1989). At all times, a judge is required to respect and comply with the law in a manner which promotes public confidence in the integrity of the judiciary. Id. (citing In re Gorby, 176 W.Va. 11, 339 S.E.2d 697 (1985)). A judge cannot wear one face as a judicial officer and another as a private citizen, since the citizenry will always appraise the integrity, independence and impartiality of the judiciary by what they see in all public and private activities of our judges. This Court has previously disciplined judges for personal activities. Miss. Comm'n on Judicial Performance v. Thomas, 722 So.2d 629 (Miss.1998); Miss. Comm'n on Judicial Performance v. McRae, 700 So.2d 1331 (Miss.1997); Miss. Comm'n on Judicial Performance v. Whitten, 687 So.2d 744 (Miss.1997). We have indicated that the case for sanction may be stronger if a judge makes comments or slurs against a particular group such as derogatory racial remarks. Guest, 717 So.2d at 332-33.
¶ 60. Other courts and judicial disciplinary groups have sanctioned judges for improper actions and comments made within as well as outside the judicial office and capacity. A California judge was sanctioned for comments made on the bench about minority groups. Gonzalez v. Comm'n on Judicial Performance, 33 Cal.3d 359, 188 Cal.Rptr. 880, 657 P.2d 372 (1983). Although the judge maintained his remarks were made in jest and assured that he always remained fair and impartial, the Commission found that subjective intent was irrelevant. A judge undertakes the "obligation to conduct himself at all times in a manner that promotes public confidence and esteem for the judiciary." Id. Even when friends or associates may know the purpose of the conduct "such facially blatant ethnic slurs as those Judge Gonzalez uttered from the bench are apt to offend minority members not familiar with petitioner's view and may be construed by the public at large as highly demeaning to minorities." Id. A New York judge was also censured for derogatory racial remarks. In re Agresta, 64 N.Y.2d 327, 486 N.Y.S.2d 886, 476 N.E.2d 285 (1985). High standards of conduct are necessary to preserve the integrity of the judiciary; therefore, it is improper for a judge to make remarks of a racist nature even when the remarks are made out of court. Id. A Florida judge was also disciplined after his "imprudent" remarks were published *1020 in a newspaper. In re Removal of a Chief Judge, 592 So.2d 671 (Fla.1992). In an interview, the judge communicated his views on interracial dating and marriage, the effect of integration on crime in the public schools, the provocative manner of dress of female students, the prevalence of blacks on welfare and in the criminal justice system, and the propriety of making racial slurs and telling racial jokes in private. His statements were described as:
freely given to a newspaper reporter, [and] have been read by a significant portion of the community as affirmatively embracing and endorsing discriminatory stereotypes that are inimical to the laws of this state, the interests of the judiciary, and the oft-stated policies of this Court, we conclude that his actions have significantly eroded his ability to work effectively with all segments of the community in administering the courts.
Id. at 672-73.
¶ 61. The judge in today's case wrote the following unsolicited letter to his local newspaper:
March 23, 2002
Dear Editor:
I got sick on my stomach today as I read the (AP) news story on the Dog attach [sic] on the front page of THE MISSISSIPPI PRESS and had to respond!
AMERICA IS IN TROUBLE!
I never thought that we would see the day when such would be here in AMERICA.
The last verse of chapter one of the book of Romans in our HOLY BIBLE is my reason for responding and sounding the alarm to this. You need to know as I know that GOD in Heaven is not pleased with this and I am sounding the alarm that I for one am against it and want our LORD to see and here [sic] me say I am against it.
I am sorry that the California Legislature enacted a law granting gay partners the same right to sue as spouses or family members. Also, that Hawaii and Vermont have enacted such a law too.
In my opinion gays and lesbians should be put in some type of a mental institute instead of having a law like this passed for them.
I don,t[sic] know but I believe if we vote for folks that are for this we will have to stand in thh[the] judgement of GOD the same as them.
I am thankful for our Legislators and pray for wisdom for them, on such unbelievable legislation as this.
May GOD bless each one of them in JESUS CHRIST NAME I pray!
Thank you for printing this,
Connie Glen Wilkerson
Bro. Connie C. Wilkerson
[stamped]
¶ 62. Additionally, in the case sub judice, the judge evidently takes the position that PRM was only interested in his views on homosexuality in his capacity as a private citizen. However, during the PRM interview he was referred to as "judge" 14 times, and there were constant questions raised as to how his personal views might affect the fairness of his courtroom proceedings.[7] Here are excerpts from the transcript of the PRM interview with the judge:
PRM News Announcement, April 10, 2002

*1021 ANNOUNCER: Judge wrote the letter to the editor of George County Times, saying, America is in trouble, that he was sick to his stomach after reading about a law passed in California, Vermont and Hawaii to grant gay partners the same rights as spouses or family members. But [he] said he had a hard time accepting such rights for homosexuals.
JUDGE: Course, us country boys hadn't been there, you know. I never run into nothing like that. That's always hearsay to us, you know, we can't believe it.
ANNOUNCER: Judge points out that he did not sign the letter as a judge.
JUDGE: I just signed it as a red blooded American, you know, Christian man. The Christian people need to take a stand as well as anybody else, you know.
ANNOUNCER: But Judge thinks his comments are separate from his role as a judge.
JUDGE: I'm not talking about it as a judge, you know. I try to be just as fair as I can in the courtroom. In fact, I'd say I'm overly fair, you know. You might could run that by people in George County.
ANNOUNCER: And Judge says he's not trying to punish homosexuals by suggesting that they belong in [mental] institutions.
JUDGE: As far as I know, a person like that's sick, you know. I wouldn't want to punish a fellow for being sick. I'd want to do something for him, help him in some way, you know. That's where I'm coming from. But I don't think he ought to have a right  extra  you know, extraordinary rights.
ANNOUNCER: Judge bases his views on deeply held religious beliefs.
JUDGE: Here's where I'm coming from. Now, if the Holy Bible's true, the King James Bible, which as a Christian man, I'd say every word from Genesis to Revelation is true, then God didn't put up with it in Sodom and Gomorrah, and that's the part that worries me, you know.
ANNOUNCER: But Judge says he means no harm to anyone.
JUDGE: God bless you, brother. I'm sorry, you know, that if I've caused anybody any hard feelings, you know, but I think in this country we need to be able to express ourselves, you know. I don't care who he is or what he is, you know, but  and when we can't do it we're really in trouble, you know.
¶ 63. I focus only on the written statements and verbal remarks the judge make regarding his opinion that a certain segment of our society was sick and needed to be placed in mental institutions. There can be no doubt that the judge in today's case made demeaning remarks in a public letter and a public interview expressing bias or prejudice against a targeted sector of the population which includes individuals who may be expected to come before his court. Even without the recent language found in the amendment to Canon 4(A), both his letter and comments during the telephone interview cast doubt on his ability to act impartially. The majority goes so far as to admit this fact. The majority acknowledges that in "publically announcing [his] views [on homosexuality]," the judge "nevertheless cast[s] doubt on his impartiality." Maj. opi. ¶ 41. To declare publicly that all persons of this class are mentally ill must at the very least cast doubt on his ability to hear their testimony without a strong, negative preconceived notion of their credibility and I thus must express earnest disagreement *1022 with his decision to make these comments in such a public way. His decision reflects poorly on him. He was not conducting himself with the utmost diligence to uphold public confidence. Instead, his actions were irresponsible. When assuming his position as justice court judge, he vowed to accept the burden of discretion in public speech necessary to promote the public's perception of his impartiality.
¶ 64. His off the bench, but highly public conduct, implies an inability to fairly hear all segments of the community. In so stating, I emphasize that in my humble opinion, whether sanctions are proper does not depend on his religious beliefs. Instead, our focus should be on the effects of his comments about a particular segment of our society, and the impact of these comments on a reasonable, knowledgeable observer. While the judge seems to have attempted to ensure that his comments were made outside of his official capacity by merely signing his name as Brother rather than Judge, such distinctions are useless where the statements suggest partiality.
¶ 65. Judges, like all other citizens, have the right to hold and express political and religious opinions. In our Judeo-Christian society, most judges are highly respected members of various churches and synagogues, and we have every right to openly express our religious views and live according to our faith. Judges also have unique duties to assure fairness and public confidence in the fairness of our courts. Judges' rights to free expression must constantly be weighed against public confidence in an impartial and independent judiciary. Although limits on extra-judicial speech can be unconstitutional under the First Amendment, the Florida Supreme Court has noted:
Judges serve on the bench in order to further the interests of justice, not their own personal interests. [A judge] must be willing to forego many of the financial and political activities that otherwise might be available to him. If an individual is unwilling to forego such opportunities, he should not be a judge.
In re DeFoor, 494 So.2d 1121, 1123 (Fla.1986). The Code of Judicial Conduct recognizes this tension and seeks a balance between the competing interests of judicial accountability and the rights of judges as citizens.
¶ 66. The right to speak on issues of public concern is at the core of those freedoms guaranteed by the First Amendment. As such, the constitutionality of content based restrictions must be reviewed with strict scrutiny. The charges before us are certainly based on the content of the judge's statements. Under a strict scrutiny analysis, the restriction must be narrowly tailored to serve a compelling state interest and must not unnecessarily circumscribe protected expression. Republican Party of Minn. v. White, 536 U.S. 765, 774-75, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002).
¶ 67. Canon 4A(1) plainly serves a compelling interest in promoting impartiality and the appearance of impartiality in our courts. While the Supreme Court in White criticized the Eighth Circuit and the state for failing to define impartiality in the court of appeals opinion and the briefs, it acknowledged that the fundamental meaning and most often use of "impartiality" is the lack of bias for or against either party to proceedings.
One meaning of "impartiality" in the judicial context  and of course its root meaning  is the lack of bias for or against either party to the proceedings. Impartiality in this sense assures equal application of the law. That is, it guarantees a party that the judge who hears the case will apply the law to him in the *1023 same way he applies it to any other party. This is the traditional sense in which the term is used....
White, 536 U.S. at 775-76, 122 S.Ct. 2528 (emphasis in original). The Court also recognized that the term can be used to mean a lack of preconception in favor of or against a particular legal view. Justice Scalia for the majority characterized impartiality as so defined as neither compelling, possible, nor desirable, since judges, who must be learned in the law will inevitably form preconceptions as to the law. Id. at 777-78, 122 S.Ct. 2528. A third definition would be "open-mindedness," or a willingness, regardless of preconceptions, to remain open to persuasion when issues are presented in a pending case. The Court did not go on to consider whether this was a sufficiently compelling interest, finding that this was not the purpose of the clause then under consideration. Id. at 778, 122 S.Ct. 2528.
¶ 68. Canon 4A(1) places a very narrow restriction on judges' speech and conduct. It requires simply and clearly that they conduct their activities off the bench so as to avoid reasonable doubt as to their impartiality. It includes no attempt to otherwise restrict judges' expression of social or political views. Indeed, it must be read with Canon 4B which expressly recognizes that judges may speak, write, lecture and teach concerning the law, the legal system, the administration of justice and non-legal subjects. The Commentary to 4B expressly recognizes that as persons specially learned in the law, judges are in a unique position to contribute to improvement of the law, "including revisions of substantive and procedural law." I am satisfied, and would so hold, that Canon 4A(1) is narrowly drafted to satisfy a compelling state interest in promoting impartiality and the appearance of impartiality in the judiciary.
¶ 69. If the judge now before this Court had done no more than express his views on statutes concerning same-sex partners and legislation regulating their activities or their rights, the analysis could stop here. As earlier mentioned, Canon 4B expressly recognizes the unique value of judges contributing to improvements of the law and the legal system and acknowledges their freedom to speak out in these areas. However, when the judge in today's case stated that certain individuals in our society were sick and that they all needed to be indiscriminately placed in mental institutions, he crossed over the line!
¶ 70. The Fifth Circuit has held that the state cannot permissibly sanction judges who publish their views on public policies and matters of public concern, particularly where they address the administration of justice, even where they are critical of the officials charged with the administration of policies. Scott v. Flowers, 910 F.2d 201 (5th Cir.1990). The majority concludes that the facts of the case sub judice are similar to those in Scott. In Scott, the Fifth Circuit reviewed the actions of a justice of the peace after he wrote an open letter to the county officials voicing his concerns of what he believed to be an injustice in the administration of the county court system. After the letter was circulated to the local press, the judge was publicly reprimanded by the Texas Commission on Judicial Conduct. The judge then filed suit against the Commission alleging this censure violated his First Amendment right of free speech. The United States District Court for the Southern District of Texas granted summary judgment in favor of the Commission, and the judge appealed to the Fifth Circuit. The Fifth Circuit held:
In Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), the Court enunciated the two-step inquiry to be used in *1024 evaluating claims of first amendment violations by public employees. First, the court must determine, in light of the "content, form, and context" of the speech in question, see Moore v. City of Kilgore, 877 F.2d 364, 369 (5th Cir.), cert. denied, 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989), whether it addresses a "matter of legitimate public concern." Pickering, 391 U.S. at 571, 88 S.Ct. at 1736.
* * *
If the court determines that the employee's speech addresses a matter of public concern, it then must balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal functions. In assessing the strength of the governmental interest, the court should consider such factors as "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (citing Pickering, 391 U.S. at 570-73, 88 S.Ct. at 1735-37).
910 F.2d at 210-11. Distinguishing the status of an elected judge from that of other public employees whose public statements may interfere with the management of their agencies, the Fifth Circuit stated:
We begin by noting that the state's interest in suppressing Scott's criticism is much weaker than in the typical public employee situation, as Scott was not, in the traditional sense of that term, a public employee.... Scott was not hired by a government employer. Instead, he was an elected official, chosen directly by the voters of his justice precinct, and, at least in ordinary circumstances, removable only by them.
As such, it was not unexpected that Scott not only would exercise independent judgment in the cases brought before him but would be willing to speak out against what he perceived to be serious defects in the administration of justice in his county. Thus, the state cannot justify the reprimand of Scott, as it could the discipline of an ordinary government employee, on the ground that it was necessary to preserve coworker harmony or office discipline.
Id. at 211-212 (internal footnote omitted & emphasis in original).
¶ 71. Finding these two cases to be similar, the majority concludes that it is more reprehensible to question the practice of the court's judiciary system than it is to state that a certain group of individuals should be institutionalized, thus creating a known bias in one's courtroom.
¶ 72. The Fifth Circuit had no difficulty concluding the judge's letter addressed matters of legitimate public concern. His criticisms did not concern his own employment conditions, but dealt with the administration of the county justice system, a matter about which the Fifth Circuit found the judge likely to have well-informed opinions. In addressing the second prong, the Fifth Circuit noted that because the justice of the peace was an elected official, he was not a traditional public employee. The Fifth Circuit held the Commission failed to carry its burden in demonstrating "that its concededly legitimate interest in protecting the efficiency and impartiality of the state judicial system outweigh[ed] [the judge's] first amendment rights." 910 F.2d at 212. Therefore, the Fifth Circuit held that the Commission could not constitutionally *1025 reprimand the justice of the peace for making public statements critical to the justice court system.
¶ 73. I find the facts of the case sub judice distinguishable from Scott. Although speech of today's judge was supposedly directed to state legislation regarding same sex partnership, he also did not hide his views on his opinions of the homosexual population as a whole. I do not agree that this type of speech  the judge's personal views regarding all homosexuals  relates to political and social community concerns. However, even if the judge's speech is found to relate to political and social community concerns, this type of speech fails the second prong by "imped[ing] the performance of the speaker's duties."
¶ 74. In a well reasoned opinion, the Supreme Court of Washington held that clear and convincing proof to restrict a judge's speech did not exist where a Supreme Court Justice spoke publicly at a right-to-life rally, identifying himself with the anti-abortion cause. In re Sanders, 135 Wash.2d 175, 955 P.2d 369 (1998). However, that court recognized that judges' right to speak out was not without limitation.
A judge's right of free speech is subject to limitation by the Canons of Judicial Conduct. However, those limitations must not be interpreted in the individual case to go so far as to permit sanctioning speech and conduct that does not clearly and convincingly lead to the conclusion that the words and actions call into question the integrity and impartiality of the judge.
Id. at 377.
¶ 75. However, the judge in the case sub judice did more than express his views on the administration of justice or a matter of public interest. His declaration that "gays and lesbians should be put in some type of a mental institution," and that "a person like that is sick," clearly and convincingly leading the public to conclude that he entertains a bias against an entire class of individuals and precipitating a reasonable fear that their pleas, arguments and testimony before his court will not be considered with the impartiality demanded of a judge. His statements taken as a whole are more akin to that made by Judge Kinsey in Florida who, during her campaign for the office issued numerous statements showing a bias in favor of law enforcement officers and promising favorable treatment toward police and victims appearing before her court. The Florida Supreme Court, looking at these statements as violative of their "pledges and promises" clause (corresponding to Canon 5A(3)(d)(i) of the Mississippi Code of Judicial Conduct), found that analysis under Republican Party of Minn. v. White leaves room for state sanctions in the interest of assuring an impartial judiciary. In re Kinsey, 842 So.2d 77 (Fla.2003).
¶ 76. In making statements, while holding judicial office, declaring that all citizens of a particular class are mentally ill and should be placed in mental institutions, the judge now before us has transgressed the protection of First Amendment which preserves the rights of all citizens to speak out on matters of public concern. Although the Code of Judicial Conduct recognizes that judges have the right to speak out on these issues and are uniquely placed to contribute to education and reform of the law and public policy, that right must be exercised without raising in the minds of reasonable people the belief that judges entertain prejudices which will substantially impair their impartiality. Finding that the evidence here is clear and convincing that the judge's intemperate statements casts doubt on his impartiality, contrary to the mandate of Canons 2A and 4A(1), I would find that the judge should be sanctioned.
*1026 ¶ 77. While I know that it is not the intent of my learned colleagues in the majority to erode our Code of Judicial Conduct, I fervently believe that today's majority decision does just that. In my almost twenty-two years as a judge, I have always firmly believed that the cornerstone of our judicial code was the already quoted commentary to Canon 2 of the former Code. I repeat it here for emphasis:
Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

(emphasis added).
¶ 78. Because I believe that this important tenet for daily judicial living, on and off the bench, has been severely undermined by today's decision, I must most respectfully, but vigorously, dissent.
GRAVES, J., JOINS THIS OPINION.
NOTES
[1] Also at issue is Article 3, Section 13, of the Mississippi Constitution, which declares: "The freedom of speech and of the press shall be held sacred; ..." However, since the constitutional analysis of the Mississippi provision would be no different from an analysis of the provision found in the United States Constitution, we restrict our analysis in this case to applicable law interpreting the United States Constitution.
[2] According to Fletcher, this Court gives great weight to the findings of the Commission, which has observed the demeanor of the witnesses, including the judge charged with the offense. Nevertheless, this Court is the trier of fact and ultimately bears the sole responsibility and duty to impose sanctions, where appropriate.
[3] In 1892, while serving as a Justice on the Massachusetts Supreme Judicial Court, Oliver Wendell Holmes, writing for the court, held that the City of New Bedford could "suspend" the constitutional rights of its police officers by preventing political speech. He stated, "The [policeman] may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892). This notion has long since been abandoned.
[4] In the context of this case, the difference between "impartiality" and "the appearance of impartiality" is that "impartiality" means a judge is fair and impartial to all; whereas "the appearance of impartiality" means the judge is not, but appears to be.
[5] During the pendency of this case, the network changed its name to Mississippi Public Broadcasting.
[6] We emphasize to the reader that this quoted canon is contained in the former Code of Judicial Conduct, which was applicable at least to the judge's actions when he wrote the letter which was later published in the local newspaper on March 28, 2002. The current Code of Judicial Conduct, adopted April 4, 2002, contains gender-neutral language.
[7] Although the judge submitted to the telephone interview on April 9, 2002, prior to traveling to Jackson to a judges' seminar where, ironically, the new Code of Judicial Conduct adopted by this Court just 5 days earlier was to be discussed, the interview was not aired by PRM until the next day.