975 So.2d 882 (2008)
MISSISSIPPI COMMISSION ON JUDICIAL PERFORMANCE
v.
Nicki M. BOLAND.
No. 2007-JP-00661-SCT.
Supreme Court of Mississippi.
February 28, 2008.
*884 Luther T. Brantley, III, Darlene Ballard and Ayanna Batiste, attorneys for appellant.
Alex A. Alston, Jr., attorney for appellee.
EN BANC.
EASLEY, Justice, for the Court.
¶ 1. On December 8, 2005, the Mississippi Commission on Judicial Performance (Commission) filed a formal complaint against Nicki M. Boland, Justice Court Judge for Hinds County, District One, Mississippi, alleging judicial misconduct which was actionable pursuant to Article 6, Section 177A, Mississippi Constitution of 1890, as amended. Judge Boland filed an answer to the formal complaint on February 21, 2006, denying the claims. The Commission held hearings on August 21, 2006, and November 10, 2006, in this matter and filed its Findings, Conclusions and Recommendations on February 20, 2007. Judge Boland then filed an objection to the Commission's findings and recommendation.
¶ 2. The Commission filed Commission Findings of Fact, Conclusions of Law and Recommendation on April 24, 2007, with this Court. Specifically, the Commission found that Judge Boland's conduct violated Canons 1, 2 A, 3 B(4), 3 B(5), and 3 C of the Code of Judicial Conduct, and that it constituted willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute pursuant to Article 6, Section 177A, of the Mississippi Constitution of 1890, as amended. The Commission recommended to this Court that Judge Boland publicly be reprimanded and assessed the costs of this proceeding in the amount of $4,108.42. This Court adopts the Commission's recommendation. However, we find that Judge Boland's conduct violated only Canons 1, 2 A, and 3 C(1) of the Code of Judicial Conduct.

FACTS
¶ 3. On December 8, 2005, the Commission filed a formal complaint against Judge Boland for a number of statements she allegedly made at a National Drug Court Institute training conference break-out session in Dallas, Texas, on September 16, 2005. The Commission asserted that Judge Boland's conduct violated Canons 1, 2 A, 2 B, 3 B(2), 3 B(4), 3 B(5), and 3 C(1) of the Code of Judicial Conduct. Further, the Commission alleged that Judge Boland's *885 conduct violated Section 177A of the Mississippi Constitution of 1890, as amended, since her conduct constituted willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute. Judge Boland filed her answer and affirmative defenses, denying the allegations.
¶ 4. The Commission held hearings over the course of two days on August 21 and November 10, 2006. During the hearings, a number of witnesses for the Commission testified to Judge Boland's actions. Judge Boland also testified and called a number of witnesses to testify on her behalf.
¶ 5. Shirley Jackson-Thomas, a grants manager for Hinds County, attended the conference in Dallas in 2005. Also attending from Mississippi, along with Jackson-Thomas, were: Malcom Harrison, Hinds County prosecutor; Denise Pendleton, drug court coordinator; Jennifer Riley-Collins, an attorney; Patricia Colwell Hinson, a juvenile drug court team member; and Judge Boland. Judge Rogelio Flores from California was the group's facilitator at the conference. In addition, Carolyn Hardin, the drug court institute director, was present at the conference.
¶ 6. Jackson-Thomas stated the group was not progressing fast enough during its break-out session, therefore they worked through lunch. Jackson-Thomas observed that Judge Boland was agitated, anxious, and probably frustrated at this point. She stated that the group was giving suggestions concerning how to structure the program when Judge Boland went into a "tirade" and ceased to be open to any of the group's suggestions. Jackson-Thomas related that Judge Boland told the group about her involvement with the drug court. Judge Boland said she felt that she was not getting any support from other justice court judges or the board of supervisors. In addition, Jackson-Thomas testified that Judge Boland said the members of the board of supervisors were not intelligent and that some justice court judges did not have degrees. Judge Boland told them that she was going to make sure that if the justice court judges did not have law degrees, then they at least should have college degrees. Furthermore, Jackson-Thomas stated that Judge Boland told Pendleton that she needed to find another job because there was not going to be a drug court. Judge Boland told Riley-Collins: "You can go home because you're not on this team anymore." Judge Boland also stated that "[a]nd you African-Americans  all you African-Americans can go to hell."
¶ 7. Jackson-Thomas stated that she was "shocked," "appalled," "embarrassed," and "angry" as a result of Judge Boland's outburst. Thereafter, everyone gathered their belongings and left the break-out session. As a result of the remarks made by Judge Boland, many of the Mississippi participants left the conference and flew home to Mississippi. Jackson-Thomas, however, returned to the conference the next day to pick up reimbursement forms. Later, Jackson-Thomas received an apology letter from Judge Boland; however, she testified that she felt that the letter lacked sincerity.
¶ 8. Hinson testified that when she and other group members asked questions about the drug-court process, Judge Boland challenged their questions. At some point, Hardin entered the room, and Judge Boland became angry. Judge Boland explained that she had worked hard on the project and felt that everyone was fighting her at every turn. Hinson stated that Judge Boland then became red-faced and yelled at Riley-Collins to "get the hell out" of the room. Hinson stated that she was "stunned" and "shocked" by Judge Boland's behavior.
*886 ¶ 9. In addition, Hinson stated that Judge Boland said something to the effect that "African-Americans in Hinds County can go to hell for all I care." After this outburst, Hinson stated that she was embarrassed and ashamed to be in the room, as she was the only other Caucasian person present. Hinson stated, "I was professionally and personally embarrassed to be a white person in a room with predominantly African-Americans because  and I did not want anyone in that room to think that anything she said spoke for me in any way, shape, or form." Hinson received an apology letter which she believed to be argumentative, defensive, and insincere. Hinson stated that she had gone shopping with Judge Boland on the previous night. While at the mall, Judge Boland had told Hinson that she did not feel well.
¶ 10. Riley-Collins stated that when Hardin walked into the break-out session, Judge Boland told Riley-Collins, "You know, you can just get the hell out." Shortly thereafter, Judge Boland told Riley-Collins, "Your attitude  your attitude stinks. You know, you're not part of this process. You can just get the hell out." Later, Riley-Collins stated that Judge Boland was frustrated when she said to forget about funding the program and stated, "As far as I'm concerned all African-Americans in Hinds County can go to hell." At this point, Riley-Collins gathered her belongings and left, along with Jackson-Thomas and Harrison. Although Riley-Collins did not mention specific comments, she stated that Judge Boland also made derogatory comments about other justice court judges and the Hinds County supervisors. Judge Boland also wrote Riley-Collins an apology letter. However, Riley-Collins felt that the letter was self-centered and was insincere.
¶ 11. Malcolm Harrison, Hinds County prosecutor, stated that during the break-out session, Judge Boland began screaming and yelling and went into a ten-to-fifteen-minute tirade in which she lambasted everyone. He related that Judge Boland stated that she was not supported by Hinds County and individuals in the county such as the members of the board of supervisors and other justice court judges. Harrison also heard Judge Boland's comment that all African-Americans in Hinds County could go to hell.
¶ 12. Harrison stated that he felt embarrassed by Judge Boland's comments, as an African-American, a lawyer, and a Mississippian. When Judge Boland made her remark about African-Americans, Harrison left the room and changed his travel reservations to return to Jackson the next day.
¶ 13. Denise Pendleton, the Hinds County drug court coordinator, testified that she was a full-time employee for the drug court. She said that, during the session, Judge Boland became agitated and frustrated. At one point, Judge Boland told Riley-Collins that she could leave if she did not want to be part of the program. When Hardin, the National Drug Court Institute representative, entered the break-out session, Judge Boland became upset. Judge Boland asked Hardin why she was there and who had asked her to come to the session. At this point, Judge Boland had her "outburst" and stated that some of the other justice court judges "were on the same level as the people that came before her, which is a GED level." Judge Boland also stated that the members of the Hinds County Board of Supervisors "were ignorant and lacked leadership." Judge Boland also stated that she was going to leave and that she was "through with the drug court." She also stated that all African-Americans in Hinds County could go to hell. Pendleton received an apology letter from Judge *887 Boland. However, like the others, Pendleton did not believe that the letter was sincere.
¶ 14. Judge Flores and Hardin both provided testimony to the Commission via deposition. Their testimony was consistent with that of the Hinds County team members who were present when Judge Boland made her statements.
¶ 15. Testifying on Judge Boland's behalf were: Judge Mike Parker, United States magistrate judge for the Southern District of Mississippi; Brenda Mathis, drug court director for Hinds County; Hinds County Justice Court Judge Frank Sutton; Louise Dillon, social worker for Catholic Charities; and Captain Nate Ross with the Hinds County Sheriff's Department.
¶ 16. Judge Boland testified concerning the many organizations in which she had participated over the years. In addition, she stated that, prior to arriving in Dallas, she had worked to assist Hurricane Katrina victims. She also stated that she had felt sick prior to getting on the plane to Dallas. While in Dallas, Judge Boland stated that she could not sleep and had blacked out in a dressing room of a Dallas mall on Thursday night.
¶ 17. Judge Boland stated that she said that the supervisors were ignorant of the drug court process. She admitted that she was frustrated and that she had stated, "As far as I'm concerned, the African-American community in Hinds County can go to hell." However, Judge Boland said that she made that comment at the same time that she stated she was going to quit, and she was exhausted at the time. She also stated that what she meant by her statement was that "people that are in drug and alcohol addiction, they're in a living hell of their own" and that if no one wanted help, then she would leave and just perform her duty as a judge only. Judge Boland stayed at the program to get certified. She said she tried to speak to the team members and to write apology letters to them.
¶ 18. Judge Parker testified that he had met Judge Boland a few years previously and that he had provided some guidance to her about the drug-court process. He also testified as to his knowledge of Judge Boland's conduct. Judge Parker stated that Judge Boland had worked hard, and that she was committed to the drug court. He also stated that he never observed Judge Boland exhibit bias, prejudice, or dishonest or unethical conduct when dealing with others.
¶ 19. Brenda Mathis had worked with Judge Boland on establishing a drug court. She stated that Judge Boland was energetic, and concerned about people, that she helped people who needed treatment, and that she made positive contributions. Mathis also stated that Judge Boland's conduct was professional and competent, and that she was very concerned about people who appeared before her on the bench. Mathis also stated that Judge Boland never showed any racial prejudice.
¶ 20. Judge Sutton also had worked with Judge Boland. He said that, in his dealings with Judge Boland, he had never detected any racial bias or discrimination. In addition, he said Judge Boland was honest in her dealings with him, and that she was trustworthy and professional.
¶ 21. Louise Dillon performed social work and therapy for Catholic Charities. She stated that Judge Boland was her client. Dillon also stated that Judge Boland was a person of integrity and competence, and that she exhibited no inclination toward bias or prejudice. Dillon said she knew that Judge Boland had worked with Hurricane Katrina victims and was probably physically and emotionally exhausted *888 prior to the conference. Judge Boland told Dillon that she had made a statement in the heat of the moment that she regretted and that she was frustrated and did not express what she meant to say. Judge Boland also told Dillon that she had told the group that she was quitting and leaving. Dillon stated that Judge Boland may have been suffering from secondary traumatic stress, which is similar to post-traumatic stress except that the traumatizing event did not personally happen to the person experiencing the stress. Dillon stated that Judge Boland had been physically exhausted when she went to Dallas and may have suffered some symptoms which may have caused her to make the uncharacteristic statements. Dillon stated that, in her opinion, Judge Boland's statements in Dallas did not reflect her true feelings.
¶ 22. Captain Ross testified that he had known Judge Boland since the time of her election. Captain Ross had participated in Judge Boland's drug court by serving warrants on people who did not complete their sentences. He stated that Judge Boland had spent a considerable amount of time starting the drug court. Captain Ross said he never observed Judge Boland showing bias or prejudice and that she treated all people who appeared before her on an equal basis.

DISCUSSION
¶ 23. The standard of review for judicial misconduct proceedings is de novo. Miss. Comm'n on Judicial Performance v. Boykin, 763 So.2d 872, 874 (Miss.2000) (citing Miss. Comm'n on Judicial Performance v. Gunn, 614 So.2d 387, 389 (Miss.1993)). The Commission's findings, when based on clear and convincing evidence, are given "great deference." Id. However, this Court is obligated to conduct an independent inquiry. Miss. Comm'n on Judicial Performance v. Neal, 774 So.2d 414, 416 (Miss.2000). Even though the Commission's findings are considered, this Court is not bound by its findings, and additional sanctions may be imposed. Miss. Comm'n on Judicial Performance v. Whitten, 687 So.2d 744, 746 (Miss.1997).
I. REFUSING TESTIMONY OR RESTRICTING TESTIMONY OF WITNESSES.
¶ 24. Judge Boland argues that the Commission erred by restricting some witnesses' testimony and refusing to allow other witnesses' testimony altogether. Judge Boland contends that during cross-examination of the Commission's witness, Jennifer Riley-Collins, the Commission restricted testimony concerning Judge Boland's interest in diversity and race relations. The record reflects that Riley-Collins testified that she had never been in the courtroom while Judge Boland conducted an adjudicatory session. When questioned whether anyone had told Riley-Collins that Judge Boland had not been fair to them in the courtroom, Riley-Collins stated that she had never spoken about Judge Boland to anyone; therefore, her answer to the question was "no." Riley-Collins also stated that she had seen Judge Boland at the Friendship Ball, an event for individuals interested in racial relations and diversity. Riley-Collins also stated that Judge Boland was part of Leadership Jackson, however, she had seen Judge Boland for only a few minutes towards the end of the program on diversity. Clearly, counsel for Judge Boland questioned Riley-Collins concerning Judge Boland's participation in events and organizations which sponsored diversity. In addition, Judge Boland gave a lengthy account of her participation in numerous organizations and events in her community. We find this issue to be without merit.
*889 ¶ 25. Judge Boland also argues that the Commission limited the cross-examination testimony of Denise Pendleton. During Pendleton's cross-examination, counsel for Judge Boland asked Pendleton about her refusal to speak to Judge Boland's counsel prior to the hearing. In addition, counsel questioned Pendleton concerning whether she went before the board of supervisors for a raise. Pendleton previously had stated that Judge Boland assisted her in getting the drug-court coordinator job and a raise in salary. When asked whether Judge Boland went to the board of supervisors to get Pendleton her salary, the Commission stopped further questioning on this point. The Commission stated that it wanted counsel to address the complaint. The Commission stated that the manner in which Pendleton was hired for her job, what kind of salary she earned, and whether she refused to speak to defense counsel were irrelevant to the proceeding.
¶ 26. This Court finds that the Commission did not err by restricting the questions concerning Pendleton's employment, salary, and refusal to speak to defense counsel prior to the hearing. These issues were addressed, and additional questioning about these restricted issues would not have pertained to Judge Boland's hearing on her conduct. Further, Judge Boland did not demonstrate any prejudice to her from the restriction of the testimony.
¶ 27. Furthermore, the record reveals that, notwithstanding the Commission's restricted questioning, Pendleton gave a significant amount of favorable testimony concerning Judge Boland. Pendleton stated that (1) she never saw Judge Boland act in a manner similar to her actions in Dallas, (2) Judge Boland was helpful to people who came before her in court, (3) Judge Boland had never showed any bias or prejudice to anyone who appeared before her, and (4) Judge Boland bent over backwards to help people who needed help in her courtroom. In addition, Pendleton stated that she knew Judge Boland was sick while in Dallas. Pendleton also stated that the drug court received funding, and it was in operation. This Court finds that Pendleton's testimony was not limited solely to Judge Boland's actions in Dallas. While the Commission limited certain aspects of Pendleton's testimony, defense counsel had an adequate opportunity to question Pendleton about her employment, Judge Boland's conduct in the courtroom, and her conduct at the conference.
¶ 28. Judge Boland also contends that the Commission erred by failing to hear the testimony of three of her witnesses. The Commission did not allow testimony from Catouche Body, deposition testimony from Charles Griffin, and testimony from John Owen. The Commission previously had heard testimony from five other witnesses concerning Judge Boland: Judge Parker, Brenda Mathis, Hinds County Justice Court Judge Frank Sutton, Louise Dillon, and Captain Nate Ross with the Hinds County Sheriff's Department.
¶ 29. The Commission considered Body, Griffin, and Owen to be additional character witnesses. The Commission considered the proffered testimony for Body, which was, in essence, that he had worked with Judge Boland as an attorney in her court, and he had never observed any racial prejudice or bias. The Commission also reviewed Griffin's proffered deposition videotape and deemed it character testimony. The deposition testimony from Griffin revealed that he had known Judge Boland and her husband for many years; their children were friends who had spent time at one another's homes; Judge Boland and his wife were friends; and, he, as a practicing lawyer, had never witnessed or heard Judge Boland show bias or prejudice *890 against individuals who appeared before her in court.
¶ 30. The Commission also heard some testimony from Owen. However, the Commission stopped Owens's testimony and ultimately determined that his testimony concerning the drug court's operations was not the subject of the hearing, as there were no allegations against Judge Boland concerning drug-court misconduct. Further, the Commission determined that numerous other witnesses whom it classified as character witnesses had testified concerning their working relationships with Judge Boland.
¶ 31. We find that the Commission did not err by excluding these three witnesses' testimony. Rule 7 of the Mississippi Commission on Judicial Performance states: "[t]he judge shall be limited to two (2) character witnesses who may testify at the formal hearing; he may submit the affidavits of any other character witness he deems appropriate."
¶ 32. Here, Judge Boland had more than two character witnesses testify on her behalf. All of Judge Boland's witnesses testified about her character. In fact, all of Judge Boland's witnesses, with the exception of Dillon, stated that she showed no bias or prejudice in her capacity as judge. Most of her witnesses praised her hard work, competence, and dedication to the drug court and helping others. Dillon was Judge Boland's therapist and therefore she did not observe her in her capacity as judge. However, Dillon stated that she thought that Judge Boland's statements were out of character and may have been due to exhaustion and secondary traumatic stress.
¶ 33. Also, the Commission heard proffered testimony and deposition testimony from the potential witnesses prior to making its decision to classify these three witnesses as character witnesses. A review of the record and the attached exhibits at issue reveal that the Commission was correct in its finding that the testimony from the three witnesses amounted to character testimony. This testimony was duplicative of that of other character witnesses who testified on Judge Boland's behalf, and it was properly excluded by the Commission.
II. FIRST AMENDMENT.
¶ 34. Judge Boland maintains that her comments at the National Drug Court Institute certification seminar in Dallas were matters of public concern. In addition, Judge Boland claims the Commission erred in its findings, and her statements are protected by freedom of speech. She relies on this Court's recent decision, Mississippi Commission on Judicial Performance v. Wilkerson, 876 So.2d 1006, 1012 (Miss.2004).
¶ 35. In Wilkerson, this Court dismissed a complaint against a justice court judge for expressing his views on gays and lesbians in a letter to a newspaper. Wilkerson, 876 So.2d at 1008. Wilkerson signed his letter as "[Brother] Connie G. Wilkerson" and not as a justice court judge. Id. The issues before this Court were whether Wilkerson's statements were protected by the First Amendment to the United States Constitution and whether he violated Canons 2(A) and 4(A)(1). Id. at 1009-10. This Court held that Wilkerson's statements were considered religious and political/public-issue speech. Id. at 1009. Accordingly, this Court imposed no sanctions against Wilkerson and dismissed the complaint. Id. at 1016.
¶ 36. In reaching its decision, this Court relied in part on Scott v. Flowers, 910 F.2d 201 (5th Cir.1990). Scott set forth the two-step test used to analyze First Amendment issues. Id. at 210 (citing Pickering v. Bd. of Educ., 391 U.S. *891 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). The Fifth Circuit Court of Appeals stated:
More recently, however, the Court has rejected that approach in favor of recognizing that public employees do not shed constitutional protection when they enter the workplace but nevertheless balancing those employees' rights against the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In Pickering, the Court enunciated the two-step inquiry to be used in evaluating claims of first amendment violations by public employees. First, the court must determine, in light of the "content, form, and context" of the speech in question, see Moore v. City of Kilgore, 877 F.2d 364, 369 (5th Cir.), cert. denied, 493 U.S. 1003, 110 S.Ct. 562, 107 L.Ed.2d 557 (1989), whether it addresses a "matter of legitimate public concern." Pickering, 391 U.S. at 571, 88 S.Ct. at 1736. If it does not, the inquiry ends, for "when employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive insight by the judiciary in the name of the First Amendment." Connick, 461 U.S. at 146, 103 S.Ct. at 1690.
Id. In Scott, the Fifth Circuit Court of Appeals also held:
If the court determines that the employee's speech addresses a matter of public concern, it then must balance the employee's first amendment rights against the governmental employer's countervailing interest in promoting the efficient performance of its normal functions. In assessing the strength of the governmental interest, the court should consider such factors as "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin [v. McPherson], 483 U.S. [378] at 388, 107 S.Ct. [2891] at 2899[, 97 L.Ed.2d 315 (1987)] (citing Pickering, 391 U.S. at 570-73, 88 S.Ct. at 1735-37).
Id. at 211.
¶ 37. Here, Judge Boland made a number of comments within a short period of time at a break-out session of the National Drug Court Institute certification seminar. The remarks made by Judge Boland and heard by a number of participants who testified or gave deposition testimony before the Commission were to the effect that (1) the members of Hinds County Board of Supervisors were ignorant; (2) some of the justice court judges were on the same level as those who appeared before her in court; (3) participant Jennifer Riley-Collins was told to "get the hell out" of the room; and (4) that African-Americans in Hinds County could "go to hell for all I care."
¶ 38. We find that Judge Boland's statements are not protected by the First Amendment. According to Scott, this Court must first consider whether the speech at issue in "light of the `content, form, and context' of the speech in question" concerns a matter of legitimate public concern. Scott, 910 F.2d at 210. If the speech is not a matter of legitimate public concern, then the inquiry into the matter ends. Id. Judge Boland attended that conference in her official capacity as a justice court judge for Hinds County. During the *892 course of the conference, progress slowed and Judge Boland became frustrated with the lack of progress. At this point, Judge Boland had an outburst that lasted approximately fifteen minutes, in which she made derogatory comments about fellow, community-elected officials, program participants, and the members of the community she served as a justice court judge.
¶ 39. While Judge Boland argues to the contrary, these remarks were disparaging insults and not matters of legitimate public concern. Judge Boland and other participants attended the conference to gain certification to operate a drug court in Hinds County. This conference was not a forum for expressing personal concerns about the alleged lack of educational background or demeanor of fellow judges or the alleged lack of intelligence of supervisors, nor was it the proper place for an alleged personal attack on a team participant, or an alleged attack on residents of Hinds County. That being said, this Court does not condone Judge Boland's comments concerning the supervisors and other justice court judges, or her outburst against a fellow drug-court participant. However, these comments do not rise to sanctionable offenses, as they were an expression of her personal opinion. Therefore, this Court will address whether Judge Boland's comment concerning African-Americans in Hinds County was judicial misconduct, which is actionable pursuant to Article 6, Section 177A, Mississippi Constitution of 1890, as amended.
¶ 40. Judge Boland attempts to liken her situation to this Court's ruling in Wilkerson. However, Judge Boland's actions are distinguishable from those in Wilkerson. In Wilkerson, the justice court judge wrote a letter to a local newspaper to express his religious views on the rights of gays and lesbians. Wilkerson, 876 So.2d at 1008. He signed his letter as a "brother" and made no reference to his elected position as a judge. Id. Without his permission, a radio show later aired a conversation Wilkerson had with a reporter concerning the letter. Id.
¶ 41. Here, Judge Boland was acting in her capacity as a justice court judge, seeking certification for a drug court for Hinds County, when she made her statement to a break-out group at the conference. The nature of her comment was an insult to individuals in the community in which she worked as a justice court judge. Her comment was not an expression of political or religious speech as in Wilkerson, nor was it an expression of commercial speech. Since Judge Boland's comment was not made within the content, form or context of a matter of legitimate public concern, no further analysis is necessary by this Court. Accordingly, we find that Judge Boland's comment was not protected by the First Amendment.
III. WHETHER JUDGE BOLAND'S CONDUCT CONSTITUTES WILLFUL MISCONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE WHICH BRINGS THE JUDICIAL OFFICE INTO DISREPUTE PURSUANT TO SECTION 177A OF THE MISSISSIPPI CONSTITUTION.
¶ 42. In judicial performance proceedings, this Court determines whether the conduct of the judge constitutes willful misconduct prejudicial to the administration of justice, which brings the judicial office into disrepute, pursuant to Section 177A of the Mississippi Constitution of 1890, as amended.
¶ 43. This Court has held:
Willful misconduct in office is the improper or wrongful use of power of his office by a judge acting intentionally or *893 with gross unconcern for his conduct and generally in bad faith. It involves more than an error of judgment or a mere lack of diligence. Necessarily, the term would encompass conduct involving moral turpitude, dishonesty, or corruption, and also any knowing misuse of the office, whatever the motive. However, these elements are not necessary to a finding of bad faith. A specific intent to use the powers of the judicial office to accomplish a purpose which the judge knew or should have known was beyond the legitimate exercise of his authority constitutes bad faith. . . .
Willful misconduct in office of necessity is conduct prejudicial to the administration of justice that brings the judicial office into disrepute. However, a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute.
Whitten, 687 So.2d at 747 (quoting In re Quick, 553 So.2d 522, 524 (Miss.1989)).
¶ 44. Based upon clear and convincing evidence, the Commission determined that Judge Boland violated Canons 1, 2 A, 3 B(4), 3 B(5), and 3 C of the Code of Judicial Conduct. In the case sub judice, Judge Boland had an outburst and made a statement which was derogatory in nature to African-Americans in Hinds County. Whether this behavior was actually willful is of no consequence. Miss. Comm'n on Judicial Performance v. Boykin, 763 So.2d 872, 875 (Miss.2000) (quoting In re Anderson, 451 So.2d 232, 234 (Miss.1984)). As this Court held:
While the conduct of Respondent, in our opinion, amounted to willful misconduct in office and conduct prejudicial to the administration of justice, bringing the judicial office into disrepute, we recognize as quoted in In re Anderson, supra, that a judge may also, through negligence or ignorance not amounting to bad faith, behave in a manner prejudicial to the administration of justice so as to bring the judicial office into disrepute. The result is the same regardless of whether bad faith or negligence and ignorance are involved and warrants sanctions.
Id.
¶ 45. We find that Judge Boland's conduct constitutes willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute.
IV. WHETHER JUDGE BOLAND SHOULD PUBLICLY BE REPRIMANDED AND ASSESSED ALL COSTS AS RECOMMENDED BY THE COMMISSION.
¶ 46. The Commission recommended that Judge Boland publicly be reprimanded and assessed all costs associated with this proceeding in the amount of $4,108.42.
¶ 47. Imposing sanctions is left solely to the discretion of this Court. Miss. Comm'n on Judicial Performance v. Jones, 735 So.2d 385, 389 (Miss.1999). The sanction, however, must fit the offense at issue. Boykin, 763 So.2d at 876. We find precedent for imposing a public reprimand and suspension from office for a period of time, and assessing the costs of these proceedings. However, Judge Boland was defeated in a recent election and no longer holds the office of Justice Court Judge for Hinds County, District One, Mississippi. Therefore, any imposition of a suspension from office is moot.
¶ 48. The Commission found that Judge Boland violated Canons 1, 2, 3 B(4), *894 3 B(5), and 3 C. Judge Boland disputes those findings in her brief.
¶ 49. Canon 1 provides:
An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Code should be construed and applied to further that objective.
¶ 50. Judge Boland argues that Canon 1 is hortatory in nature and an expression of the general overview of the Code of Judicial Conduct. Further, Judge Boland relies on Mississippi Commission on Judicial Performance v. Judge U.U., 875 So.2d 1083, 1089-90. In Judge U.U., this Court found that a chancellor violated Canon 3(A)(5) for failure to timely issue opinions, and imposed a private reprimand. Id. at 1096. This Court held that Judge U.U., based on the facts of that case, did not violate Canon 1, because his actions did not involve questions of independence and were not dishonorable. Id. at 1090. Judge Boland argued that in Judge U.U., this Court held that the language of Canon 1 "emphasizes failure which rise[s] to the level of impugning the independence and honor of the judiciary," which did not occur in her case. Id. at 1089.
¶ 51. The comments to Canon 1 initially concern deference to judgments and rulings that rely upon the integrity and independence of a judge. See Canon 1 cmt. However, the comments to Canon 1 also address generally the need for judges to comply with the Code of Judicial Conduct, stating, "Conversely, violation of this Code diminishes public confidence in the judiciary and thereby does injury to the system of government under law." See Canon 1 cmt.
¶ 52. In Judge U.U., the Court addressed a judge's delay in writing opinions. The Court in Judge U.U. also considered the "facts and circumstances peculiar to [that] particular case." Judge U.U., 875 So.2d at 1090. Here, the facts of Judge Boland's case were that, in her capacity as judge, she made a derogatory, public statement concerning African-American members of her community. While the statement was insulting as opposed to a chargeable, dishonest act, the statement brought the integrity of the judiciary into question. Therefore, this case is distinguishable from Judge U.U. This Court finds that Judge Boland's actions violated Canon 1.
¶ 53. Judge Boland also argues that she did not violate Canon 2. The basis of her assertion is that there was no evidence that she violated the law, and Canon 2 prohibits a judge from violating the law. Canon 2 A and its commentary provides:
A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
Commentary
Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on the judge's conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all *895 prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rules or other specific provisions of this Code. The test for appearance of impropriety is whether, based on the conduct, the judge's impartiality might be questioned by a reasonable person knowing all the circumstances.
(Emphasis added).
¶ 54. Canon 2 and its commentary clearly go beyond a judge's potential violation of law. Canon 2 addresses a judge's avoidance of the appearance of impropriety. The test for impropriety is whether a judge's impartiality might be questioned by a reasonable person knowing all the circumstances. See Commentary Canon 2. In Judge U.U., this Court found that there was no violation of Canon 2, even though the judge "clearly exhibited a lack of diligence and timeliness in the disposition of the subject cases," however "the facts as revealed in the record before us do not involve moral turpitude or bias so as to constitute a violation of this specific canon." Judge U.U., 875 So.2d at 1090. Here, Judge Boland's statement concerning the African-Americans within her community might be questioned by a reasonable person knowing all the circumstances, and thus, it meets the test for impropriety.
¶ 55. Judge Boland also contends that she did not violate Canons 3(B)(4) and 3(B)(5), since her comment was not made at an adjudicative proceeding. The record is clear that Judge Boland made her comment at a break-out session of the National Drug Court Institute in Dallas. The overview or caption of Canon 3(B) refers to "adjudicative responsibilities." See Canon 3(B). Canon 3 B(4) provides:
Judges shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacities, and shall require similar conduct of lawyers, and of their staffs, court officials, and others subject to their direction and control.
Canon 3 B(5) provides:
A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, gender, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so. A judge shall refrain from speech, gestures or other conduct that could reasonably be perceived as sexual harassment and shall require the same standard of conduct of others subject to the judge's direction and control.
The comments that directly follow Canons 3(B)(1)-(4) and the comments directly following Canon 3(B)5 are written in terms of "proceedings." We agree with Judge Boland's position that she did not violate Canons 3(B)(4) and (5). While Judge Boland's comment was made in her capacity as a judge, the comment was not made at an adjudicative proceeding. Therefore, the Commission erred by finding that Judge Boland violated Canon 3(B)(4) and (5).
¶ 56. Lastly, Judge Boland argues that she did not violate Canon 3(C). More specifically, Judge Boland contends that: (1) no one addressed the provisions of Canon 3 at the hearing; (2) the Commission never specified which subsection of Canon 3(C) that she allegedly violated; (3) she has never violated any of the subsections; *896 and (4) Canon 3(C) is simply irrelevant. Canon 3 C provides:
(1) A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and shall cooperate with other judges and court officials in the administration of court business.
(2) A judge shall require staff, court officials and others subject to the judge's direction and control to observe the standards of fidelity and diligence that apply to the judge and to refrain from manifesting bias or prejudice in the performance of their official duties.
(3) A judge with supervisory authority for the judicial performance of other judges shall take reasonable measures to assure the prompt disposition of matters before them and the proper performance of their other judicial responsibilities.
(4) A judge shall not make unnecessary appointments. A judge shall exercise the power of appointment impartially and on the basis of merit. A judge shall avoid nepotism and favoritism. A judge shall not approve compensation of appointees beyond the fair value of services rendered.
(5) A judge shall not appoint a major donor to the judge's election campaign to a position if the judge knows or learns by means of a timely motion that the major donor has contributed to the judge's election campaign unless
(a) the position is substantially uncompensated;
(b) the person has been selected in rotation from a list of qualified and available persons compiled without regard to their having made political contributions; or
(c) the judge or another presiding or administrative judge affirmatively finds that no other person is willing, competent and able to accept the position.
¶ 57. Judge Boland is correct in her assertion that the Commission did not specify which of the subsections of Canon 3(C) that she allegedly violated. A review of the record reveals that the only subsection of Canon 3(C) at issue before this Court is subsection (1). Judge Boland volunteered to attend the drug court training in Dallas. She attended the conference in her official capacity as a judge. While at the conference, she made a derogatory comment. The statement placed Judge Boland's impartiality at issue. In addition, her actions lacked professional courtesy and cooperation with others in the administration of court business. Accordingly, we find that Judge Boland violated Canon 3(C)(1).
¶ 58. In determining the appropriate sanction for each case before this Court, we review mitigating factors pursuant to this Court's holding in In re Baker, 535 So.2d 47, 54 (Miss.1988). In Mississippi Commission on Judicial Performance v. Gibson, 883 So.2d 1155, 1158 (Miss. 2004), this Court modified Baker to apply generally to the determination of all sanctions in judicial misconduct proceedings rather than merely to apply to the question of public reprimand. We now examine the appropriateness of sanctions here based on the following factors:
(1) The length and character of the judge's public service.
¶ 59. Judge Boland held her position from January 2004 until her recent defeat. The Commission's and Judge Boland's briefs, Judge Boland's testimony, and other *897 witnesses testimony contained information concerning the judge's abundant public service. Judge Boland has worked on a large number of projects within the Hinds County community and has assisted or implemented a number improvements within the Hinds County court system.
(2) Whether there is any prior case law on point.
¶ 60. Judge Boland argues that there is no precedent for giving a public reprimand for her statements. This is incorrect. In Mississippi Judicial Performance Commission v. Walker, 565 So.2d 1117, 1126 (Miss.1990), this Court imposed a public reprimand for one offense. In Walker, a circuit court judge jailed a litigant for more than twenty-four hours without bond because of an alleged slur against the judge. Id. at 1125. In In re Anderson, 451 So.2d 232, 234 (Miss.1984), this Court also imposed a public reprimand where a judge failed on three occasions to issue writs of garnishments. These cases demonstrate that a public reprimand is appropriate whether viewed as one occurrence or many occurrences of the same offense.
¶ 61. Furthermore, this Court has created precedent for imposing a thirty-day suspension, in addition to a public reprimand and costs, for a judge with no prior pattern of inappropriate conduct. Miss. Comm'n on Judicial Performance v. Sanford, 941 So.2d 209, 216 (Miss.2006). In Sanford, the judge requested that an officer arrive late to court so that first-offense, driving-under-the-influence charges could be dismissed against a party. Id. at 210. Despite no evidence of a pattern of inappropriate conduct, this Court imposed a public reprimand, thirty-day suspension, and assessment of costs. Id. at 218. This Court held that "we now disagree that a public reprimand, alone, is the appropriate sanction for a judge who engages in such egregious conduct which undermines our system of justice." Id. at 217. While Judge Boland made a derogatory comment as opposed to dismissing charges against a defendant, her actions also were egregious and undermined our system of justice.
(3) The magnitude of the offense and the harm suffered.
¶ 62. Judge Boland, in her official capacity as a judge, made a derogatory and offensive comment in a drug court seminar. This action involved Mississippi team members and national drug court representatives. All of the witnesses who attended the conference and testified before the Commission stated that they were shocked, appalled, and embarrassed by Judge Boland's statement.
(4) Whether the misconduct is an isolated incident or evidences a pattern of conduct.
¶ 63. The Commission and Judge Boland acknowledged that she had no prior disciplinary history. Therefore, Judge Boland has no pattern of conduct to consider.
(5) Whether "moral turpitude" was involved.
¶ 64. In Mississippi Commission on Judicial Performance v. Justice Court Judge T.T., 922 So.2d 781, 786 n. 4 (Miss. 2006), this Court defined moral turpitude to include "actions which involve interference with the administration of justice, misrepresentation, fraud, deceit, bribery, extortion, or other such actions which bring the judiciary into disrepute." More recently, in Mississippi Commission on Judicial Performance v. Sanford, 941 So.2d 209, 217 (Miss.2006), this Court expanded the meaning of moral turpitude to include respecting and upholding the dignity of the judiciary through appropriate conduct and behavior towards others. *898 Here, Judge Boland's statement was inappropriate, and her conduct and behavior were contrary to the dignity of the judiciary.
(6) The presence or absence of mitigating or aggravating circumstances.
¶ 65. Aggravating circumstances are present in this case. Judge Boland made derogatory statements toward members of her constituency which adversely affected a multitude of individuals, including court staff and parties appearing before her. Mitigating circumstances are present in that Judge Boland was exhausted and fatigued at the time of her statements.
¶ 66. We find that Judge Boland shall be publicly reprimanded and assessed all costs associated with this proceeding, amounting to $4,108.42. Judge Boland no longer holds the position of Justice Court Judge, District One, Hinds County, Mississippi, and, therefore, the additional imposition of a suspension from office for a period of time is moot.

CONCLUSION
¶ 67. We find that the conduct of Nicki M. Boland, Justice Court Judge, District One, Hinds County, Mississippi, constituted willful misconduct in office and conduct prejudicial to the administration of justice which brings the judicial office into disrepute pursuant to Article 6, Section 177A of the Mississippi Constitution of 1890, as amended.
¶ 68. For the reasons stated, we accept the recommendation of the Commission for the issuance of a public reprimand and assessment of costs. We do not impose an additional suspension period, as Judge Boland is no longer in office and the issue is moot. We order that a public reprimand and assessment of the costs in the amount of $4,108.42 shall be imposed against Judge Boland. This public reprimand shall be read in open court, when the venire panel meets, on the first day of the next term of the Circuit Court of Hinds County, with Judge Boland present.
¶ 69. JUDGE NICKI M. BOLAND, JUSTICE COURT JUDGE FOR HINDS COUNTY, DISTRICT ONE, SHALL BE PUBLICLY REPRIMANDED IN OPEN COURT WHEN THE VENIRE PANEL MEETS BY THE PRESIDING JUDGE OF THE HINDS COUNTY CIRCUIT COURT ON THE FIRST DAY OF THE NEXT TERM OF THAT COURT AFTER THIS DECISION BECOMES FINAL AND IS ASSESSED COSTS IN THE AMOUNT OF $4,108.42.
DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. CARLSON, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY GRAVES, J. SMITH, C.J., and WALLER AND DIAZ, P.JJ., NOT PARTICIPATING.
CARLSON, Justice, Specially Concurring:
¶ 70. While I fully concur in today's majority opinion, I write separately to briefly state that in addition to the reasons set forth by the majority to conclude that Issue II has no merit, I would also rely on the reasoning set forth in the dissent in Mississippi Commission on Judicial Performance v. Wilkerson, 876 So.2d 1006, 1017-26 (Miss.2004) (Carlson, J., dissenting, joined by Graves, J.).
GRAVES, J., JOINS THIS OPINION IN PART.